717 A.2d 332 (1998)
UNITED MINE WORKERS OF AMERICA, INTERNATIONAL UNION, Appellant,
v.
Jean L. (Marat) MOORE, Appellee.
No. 96-CV-1373.
District of Columbia Court of Appeals.
Argued November 18, 1997.
Decided September 3, 1998.
*334 Daniel B. Edelman, with whom Grant Crandall, John R. Mooney, and Elizabeth A. Saindon, Washington, DC, were on the brief, for appellant.
Bruce A. Frederickson, with whom Susan Brackshaw, Linda Correia, and Jonathan C. Puth, Washington, DC, were on the brief, for appellee.
Before TERRY, RUIZ and REID, Associate Judges.
REID, Associate Judge:
Appellant, United Mine Workers of America, International Union ("UMWA"), appeals from a judgment entered against it in a sex (gender) discrimination case brought by appellee Jean L. (Marat) Moore.[1] Ms. Moore alleged sex discrimination under the District of Columbia Human Rights Act ("DCHRA"), D.C.Code §§ 1-2501 et seq. (1992). The jury awarded her $300,000 in compensatory damages (including damages for future lost earnings and emotional distress), and $150,000 in punitive damages. The trial court denied UMWA's post-judgment motion for judgment as a matter of law or new trial or remittitur. We affirm the trial court's denial of judgment as a matter of law or new trial as to liability and compensatory damages; however, finding insufficient evidence to support an award of punitive damages, we reverse the trial court's judgment as to punitive damages as a matter of law.

FACTUAL SUMMARY
Testimony introduced during Ms. Moore's jury trial revealed her employment history with the UMWA and the events leading to her termination. In October 1983, UMWA hired Ms. Moore as a staff writer and photographer for the United Mine Workers ("UMW") Journal, at an initial salary of $26,000. At the time, she held a B.A. degree in English from Duke University,[2]magna cum laude, and had worked as a coal miner for UMWA Local 8840 in 1979-80 in Mingo County, West Virginia. In addition to her work as a staff writer and photographer, focusing on safety investigations in mines, she was active in the Coal Employment Project ("CEP"), an organization devoted to the interests of female coal miners.[3] She received awards for her writing and photography.
Ms. Moore was promoted to the position of program coordinator in the UMWA Organizing Department in 1989, at a salary of $40,500. In that capacity, she became a field organizer and spent most of her time in Southwest Virginia. Approximately one year later, she left UMWA to do freelance writing, and to complete a book on the history of female coal miners in the United States. In July 1992, UMWA asked her to return to the Communications Department, as an associate editor of the UMW Journal, at the salary of $40,500. She joined the editor, Greg Hawthorne, and another associate editor, Tom Johnson. Later, Tim Baker became a staff writer for the UMW Journal. Ms. Moore continued her association with the CEP, and was elected to its board of directors in 1993.
*335 CEP's June 1994 conference was scheduled to be held in Evansville, Indiana. Ms. Moore played no role in the organization of the conference, or the selection of a hotel for the conference events. However, sometime around October 1993, she advised an assistant to the vice president of UMWA, Brad Burton, that the conference would be held at the Executive Inn. The Executive Inn was owned by Robert Green, who also had an ownership interest in nonunion mines through the Green Coal Company. Mr. Burton became upset and explained that Mr. Green owned nonunion mines, and that he, Mr. Burton, had tried to organize workers at the Green Coal Company around 1978. CEP made efforts to obtain other accommodations in Evansville, but discovered that no other suitable hotel was available in that city. When CEP broached the matter later with the Executive Inn, its advisory committee was informed that after Robert Green's death, his son had sold the family coal mining operations in April 1993. Ms. Moore provided these details to Mr. Burton in a January 10, 1994 memorandum, and asked for "suggestions about any other possible locations."[4] Eventually, the conference site was switched to St. Louis, Missouri.
One of the witnesses at Ms. Moore's trial concerning her termination was Greg Hawthorne, a staff writer and photographer for the UMW Journal in 1983, managing editor in 1985, director of publications and editor in 1990, and head of the Department of Communications from 1991 to 1994, when he transferred to the legal department after obtaining his law degree. According to him, Mr. Burton called him into a meeting in January 1994 in which Mr. Robert Stropp, then UMWA General Counsel, participated. Mr. Burton told Mr. Hawthorne to "start looking for more staff, because he was going to fire [Ms. Moore] and Tom Johnson both." He questioned "their loyalty and their judgment." Mr. Hawthorne said he did not want to fire either Ms. Moore or Mr. Johnson because he "was happy with the work they did for [him]." Mr. Burton also advised Richard Trumka, President of the UMWA, of his desire to terminate Ms. Moore and Mr. Johnson, and to transfer Mr. Baker to another department.
Mr. Burton sent a personal and confidential memorandum to Mr. Trumka on February 7, 1994, listing the names of ten staff and wage employees to be terminated, effective February 15, 1994, including Ms. Moore, the only female on the list. Mr. Johnson's name was not on the list.[5] The full-time males on the list previously had been informed of their shortcomings such as incompetency and dishonesty, and had been given opportunities to correct their behavior. Ms. Moore had never been informed of any shortcomings. On February 9, 1994, Mr. Burton summoned Mr. Hawthorne to a meeting with Mr. Trumka, and instructed Mr. Hawthorne to terminate Ms. Moore, but not Mr. Johnson. On the same day, Mr. Hawthorne sent a memorandum to Mr. Burton setting forth the names of persons selected to replace Ms. Moore and Mr. Baker, who had been transferred to another department. The memorandum listed the names of Calvin Zon, described as "a longtime writer and associate editor at Press Associates, a labor-oriented news service for unions and other progressive groups"; and J.D. Hill, a labor union member, depicted as "a total team player ... [who] wrote for a local newsletter, and [was] 5 credits short of a B.A. in Labor-Management Relations." Mr. Hawthorne's request to hire the two men was approved on February 9, 1994. Calvin Zon apparently commenced his duties on April 18, 1994, at a salary of $40,500, the same salary Ms. Moore was earning when she was terminated.
Ms. Moore was told of her termination orally and in writing on February 10, 1994. Mr. Hawthorne spoke with Ms. Moore and *336 said, inter alia, "This really sucks, but there is a layoff list, and you're on it.... I tried to fight for you but I was told there would be no discussion."[6] Mr. Burton sent Ms. Moore a written memorandum attributing her termination to "finances and considerations surrounding the overall efficiency of [UMWA's] organization."[7]
Ms. Moore was instructed not to return to UMWA after February 10, 1994, and her request for exit interviews with Mr. Trumka and two other UMWA officers was denied. After an extensive search for another job, Ms. Moore found a part-time position in June 1994, writing "national news, business news, [and] sports" at Standard News at a wage of $12 per hour, with no health benefits. Several months later, when UMWA advertised the communications director position, Ms. Moore sent a June 30, 1994 letter of application to Mr. Trumka, with a copy to Mr. Hawthorne. She sent a follow-up letter on July 25, 1994 to UMWA's personnel director, Mr. Baker. On August 1, 1994, UMWA increased Mr. Zon's salary from $40,500 to $43,750, and made the same adjustment to Mr. Johnson's salary. On the next day, Mr. Baker acknowledged receipt of Ms. Moore's letter of application, but maintained that "the UMWA has no job vacancies." In December 1995, Ms. Moore was hired by the American Speech Language Hearing Association in Rockville, Maryland as a news writer and producer, at a salary of $37,200.
Ms. Moore filed a verified complaint in the Superior Court of the District of Columbia on February 6, 1995, alleging sex discrimination with respect to her termination. A jury trial took place in late April and early May 1996. In addition to presenting evidence detailing her work history with UMWA, her qualifications and achievements as a writer, and events surrounding her termination, all described above, Ms. Moore recounted instances in which UMWA officials made comments pertaining to female employees.
When the name Lisa Parnell, a female coal miner from Alabama and a person active in the CEP appeared in a UMWA newsletter, Mr. Burton reportedly ordered the UMW Journal "to sever all ties with [her]." In addition, Mr. Stropp, UMWA's General Counsel, told Ms. Moore in mid-October 1993 that "Lisa got in ... some trouble down [in Alabama]." Ms. Moore asked him what he meant, citing the $14,000 Ms. Parnell helped to raise to support a 1993 strike. Mr. Stropp replied: "Well, ... [y]ou know how she is.... You know, Marat, you can't be a woman and be outspoken in this union."[8] Ms. Moore retorted: "Yes, you can Bob, but you pay the price."
After the jury returned a verdict in Ms. Moore's favor, and awarded her compensatory and punitive damages, UMWA filed a "motion for judgment as a matter of law or in the alternative for new trial or remittitur." The trial court denied the motion for judgment as a matter of law or new trial as to liability, stating:
Here the only substantial question was whether Plaintiff proved her discharge arose from gender discrimination notwithstanding Defendant's explanation that her discharge was based upon her mishandling of the CEP conference scheduled at the Executive Inn in Evansville, [Indiana,] a hotel owned by coal mine operators who were particularly offensive to the UMWA. On that question there was substantial evidence supporting Plaintiff's view of the evidence. Plaintiff was placed on a termination list with nine males who were palpably less qualified than Plaintiff. Plaintiff was told her discharge was for financial reasonsadmittedly a pretext, according to the Defendant, (in order to spare the feelings of those discharged). A substantially less qualified male was hired to replace Plaintiff after a search conducted in secret before Plaintiff was told she was terminated, for "financial" reasons. A *337 male colleague, Mr. Johnson, was terminated a year after Plaintiff for conduct which could be seen as more seriously deficient than hers.
All of these facts taken together support a finding that Defendant discriminated.... All of Defendant's contentions correctly point out things the jury could have found, but did not. On this record, the Court cannot conclude the verdict is at substantial and weighty variance with the evidence....
The trial court also denied UMWA's motion concerning damages, finding that the evidence supported both the compensatory and punitive awards:
As to the showing of damages, [UMWA's] contentions are similarly unpersuasive. [Ms. Moore's] husband testified as to the substantial emotional impact of her discharge, and [her] economist testified as to her prospective loss of income both allowable elements under the [DCHRA]. The evidence, viewed in its entirety amply supports the verdict for compensatory damages.
Punitive damages are allowable when the conduct in issue exceeds all bounds of reason, Arthur Young & Co. v. Sutherland, 631 A.2d 354 (D.C.1993). Here the Plaintiff offered evidence that her discharge, ostensibly for financial reasons, followed a search and identification of a less qualified male replacementevents she only learned about through the efforts of an anonymous insider who sent her a copy of a memo detailing them. Although it did not have to, the jury could have concluded these facts reflected the type of intentional disregard of Plaintiff's right to gender neutral employment that punitive or exemplary damages were intended to deter. Its verdict should not be disturbed.

ANALYSIS
On appeal, UMWA argues that the trial court erred in denying its motion (1) for judgment as a matter of law or a new trial because Ms. Moore failed to prove discriminatory intent, and UMWA established a legitimate, non-discriminatory reason for termination of her employment; (2) for remittitur of the compensatory damages award because the evidence was insufficient to support that portion pertaining to future lost earnings and emotional distress; and (3) for judgment as a matter of law or new trial or remittitur concerning punitive damages, because the evidence was insufficient to support the award. Ms. Moore contends that the record and transcripts support the jury's finding of sex discrimination, and the award of compensatory damages, including future lost earnings and emotional distress, as well as punitive damages.

Ms. Moore's Sex (Gender) Discrimination Claim And UMWA's Motion For Judgment As A Matter Of Law Or New Trial
UMWA contends that the trial court erred in denying its motion for judgment as a matter of law or new trial regarding its liability. Generally, a motion for judgment after trial and verdict is granted only in "`extreme' cases." Daka, Inc. v. Breiner, 711 A.2d 86, 96 (D.C.1998) (quoting Oxendine v. Merrell Dow Pharm., Inc., 506 A.2d 1100, 1103 (D.C.1986)). "[W]e review the denial of such a motion deferentially. Reversal is warranted only if `no reasonable person, viewing the evidence in the light most favorable to the prevailing party, could reach a verdict in favor of that party.'" Id. (quoting Arthur Young & Co. v. Sutherland, 631 A.2d 354, 363 (D.C.1993) (citations and internal quotations omitted)). See also District of Columbia v. Walker, 689 A.2d 40, 42 (D.C.1997). Furthermore, "[t]he trial court has broad latitude in passing upon a motion for new trial," and we review the disposition of such a motion only for abuse of discretion. Gebremdhin v. Avis Rent-A-Car System, Inc., 689 A.2d 1202, 1204 (D.C.1997). To grant a motion for a new trial, the trial court must find that the verdict is against the weight of the evidence, or that there would be a miscarriage of justice if the verdict is allowed to stand. Id.
Ms. Moore claimed that she was terminated from her employment as an associate editor of the UMW Journal because of her sex (female gender), and that UMWA hired a less qualified male to fill her position, in *338 violation of the DCHRA. D.C.Code § 1-2512(a)(1) and (3) provide in pertinent part:
(a) General.It shall be an unlawful discriminatory practice to do any of the following acts, wholly or partially for a discriminatory reason based upon the race, color, religion, national origin, sex, age, marital status, personal appearance, sexual orientation, family responsibilities, disability, matriculation, or political affiliation of any individual:
(1) By an employer.To fail or refuse to hire, or to discharge, any individual; or otherwise to discriminate against any individual, with respect to his compensation, terms, conditions, or privileges of employment, including promotion; or to limit, segregate, or classify his employees in any way which would deprive or tend to deprive any individual of employment opportunities, or otherwise adversely affect his status as an employee;
* * *
(3) By a labor organization.[T]o classify, or fail, or refuse to refer for employment any individual in any way, which would deprive such individual of employment opportunities, or would limit such employment opportunities, or otherwise adversely affect his [or her] status as an employee or as an applicant for employment[.]
To prove sex or gender discrimination under the DCHRA, Ms. Moore was required, initially, to "make a prima facie showing of discrimination by a preponderance of the evidence." Arthur Young & Co., supra, 631 A.2d at 361. A prima facie case may be made by demonstrating that: (1) the employee "was a member of a protected class, (2) ... she was qualified for the [position or] promotion, (3) ... she was rejected upon seeking the promotion, and (4) ... a substantial factor in that rejection was [her] membership in the protected class." Id. If the employer then satisfies its burden "`by articulating some legitimate nondiscriminatory reason for [the termination],'" Id. (citations omitted), "the burden shifts back to the employee to prove, ... by a preponderance of the evidence, that the employer's stated justification for its action `was not its true reason but was in fact merely a pretext' to disguise discriminatory practice." Id. (citations omitted).
Here, Ms. Moore established that she (1) was a member of a protected class, the female sex; (2) was qualified for the position of associate editor due to her educational background, including a B.A. in English, her past work as a coal miner, her years of experience as a writer and editor with the UMW Journal, and her awards during her tenure with the UMWA; (3) was rejected for the position, as evidenced by her termination and the approval of Mr. Zon as her replacement prior to her termination, and the failure of the UMWA to rehire her as a result of its June 1994 advertisement; and (4) a substantial factor in her termination was her female sex, as shown by the fact that (a) she was the only female terminated in February 1994, with men who, unlike her situation, had previously been warned of their shortcomings pertaining, inter alia, to incompetency and dishonesty; (b) men less qualified than she were retained and a less qualified male was hired and placed in her position; and (c) officials of the UMWA made negative remarks about female employees who were outspoken.
UMWA articulated through Mr. Burton its alleged legitimate nondiscriminatory reason for terminating Ms. Moore: the Executive Inn incident. Ms. Moore met her burden of showing, by a preponderance of the evidence, that the stated justification was a pretext designed to conceal UMWA's sex discrimination. Testimony and documentary evidence introduced by Ms. Moore at trial revealed UMWA had offered varying justifications for her termination. Mr. Burton testified at trial that Ms. Moore was terminated "because of her poor judgment in dealing with me and the Executive Inn." According to Mr. Hawthorne, in January 1994, Mr. Burton questioned Ms. Moore's loyalty and judgment as the reasons for wanting to terminate her. However, in his February 10, 1994 memorandum, Mr. Burton informed Ms. Moore that her layoff was attributable to "finances and considerations surrounding the overall efficiency of [UMWA's] organization." During his September 1995 deposition, Mr. Burton *339 maintained that union funds were depleted after a strike; income from dues had been lost; and "we picked people that we thought we could operate most efficiently without, and [Ms. Moore] fell in that category." At an April 15, 1994 meeting of the CEP board, Cecil Roberts, a vice president of UMWA, declared "the union had a long strike and that [Ms. Moore] was one of many who had been terminated."
Significantly, trial testimony and record documents reveal that UMWA's search for Ms. Moore's replacement took place prior to February when she received written notice of her termination due to financial reasons. When CEP board members inquired on April 15, 1994, as to whether Ms. Moore's position would be filled, Mr. Roberts said: "Well, we're hiring an intern," and denied knowledge of anyone else "being hired permanently in the journal." He also asserted there was no problem with Ms. Moore's job performance.
Mr. Zon, who was hired on April 18, 1994, at a salary of $40,500, had no experience as a professional photographer, or coal miner, and had not previously written for the UMW Journal. In addition, the men with whom Ms. Moore was terminated were, as the trial court put it, "palpably less qualified" than Ms. Moore, and Mr. Zon was "substantially less qualified."
In short, reasonable jurors could reasonably find that Ms. Moore sustained her burden of proof under the DCHRA. The record before us reflects substantial evidence supporting the trial court's conclusion that the jury verdict relating to liability was not against the clear weight of the evidence.

The Compensatory Damages Award
UMWA challenges the award of front pay or future economic loss and emotional distress damages to Ms. Moore. UMWA contends that: (1) Ms. Moore did not seek reinstatement to her position or show that reinstatement was not practicable; and (2) the trial court had no basis for assuming that (a) Ms. Moore would have been relegated to lower paying jobs or (b) would have remained at UMWA for the remainder of her worklife. Therefore, UMWA maintains, if Ms. Moore was entitled to any damages for lost pay, they should have been imposed from the date of her termination to the date of judgment. Thus, the damages for lost wages would have amounted to only $60,000.
Ms. Moore argues that UMWA waived its right to raise the issue of future economic loss because it failed to object to testimony presented by Dr. Richard Lurito, her economic expert. In addition, she argues, she is entitled to damages for future economic loss under the case law, and further, UMWA failed to show the availability of comparable work at higher wages.
Our review of an award of compensatory damages is "limited and highly deferential" because the trial court has "broad discretion" to determine appropriate relief under the DCHRA. Daka, supra, 711 A.2d at 100; see also D.C.Code § 1-2556(b); Arthur Young & Co., supra, 631 A.2d at 373.

Future Economic Loss or Front Pay
In response to Ms. Moore's argument that it waived its objection to her claim for front pay damages, UMWA asserts in its reply brief that it "did raise the lack of and evidentiary support for the award of frontpay-to-retirement [sic] damages ... through its post-verdict motion for judgment as a matter of law." Even assuming that UMWA preserved its objection to the award of front pay damages to Ms. Moore, we see no reason to disturb the trial court's judgment with respect to the front pay damages.[9]
UMWA's attack on Dr. Lurito's methodology, assumptions, and calculations of Ms. Moore's lost income is unavailing.[10] Ms. *340 Moore testified that she planned to work until age 62, and proved that her then current income was less than she would have received if she had not been terminated. She worked in the coal mining industry from about 1979 until her termination in 1994, and testified about her desire for a career in that industry. Furthermore, UMWA made no effort at trial to show the availability of comparable work at a salary higher than the compensation paid her by the American Speech Language Hearing Association.
Therefore, there was ample evidence to support an award of $171,226 to $197,864 for lost income, as computed by Dr. Lurito.[11]See Estate of Underwood v. National Credit Union, 665 A.2d 621, 643 (D.C. 1995); District of Columbia v. Barriteau, 399 A.2d 563, 567 (D.C.1979). "[A] party is not required to prove damages to a degree of mathematical certainty, ... but must instead offer some evidence which allows the trier of fact to make a reasoned judgment." Morgan v. Psychiatric Institute of Washington, 692 A.2d 417, 426 (D.C.1997) (citations omitted); Barbour v. Merrill, 310 U.S.App.D.C. 419, 429, 48 F.3d 1270, 1280 (D.C.Cir.1995) (citations omitted) ("court should not refuse to award front pay merely because some speculation about future earnings is necessary, or because parties have introduced conflicting evidence"). We see no reason to disturb the trial court's judgment as to future economic loss or front pay.

Emotional Distress Damages
To counteract UMWA's argument that there is no support in the record for an award of emotional distress damages, Ms. Moore argues that, under this court's standard of review, her testimony and that of her husband support the award of damages for emotional distress. The amount awarded by the jury, which the trial court declined to set aside or reduce, appears to approximate $100,000 to $129,000.[12] Ms. Moore points to Wingfield v. Peoples Drug Store, 379 A.2d 685 (D.C.1977) in which we said that: "a verdict is excessive ... [if it] is `beyond all reason, or ... is so great as to shock the conscience.'" Id. at 687 (quoting Williams v. Steuart Motor Co., 161 U.S.App.D.C. 155, 494 F.2d 1074 (1974)). We also stated that: "Alternatively, the test has been stated to be whether the verdict `is so inordinately large as obviously to exceed the maximum limit of a reasonable range within which the jury may properly operate.'" Id. (citation omitted). "This court will reverse the trial judge's determination only for an abuse of discretion." Weinberg v. Johnson, 518 A.2d 985, 994 (D.C.1986) (citation omitted).
Ms. Moore contends that because of her "deep devotion and commitment to her career as a mine labor journalist and to miners themselves[, her] abrupt firing ... was a traumatic event." Her husband, Steve Linder, testified as to Ms. Moore's immediate reaction to her termination. She had a "weakened physical appearance," was "upset and shocked," "bewildered," and "devastated." He also stated that Ms. Moore "lost things that sort of defined her work or ... defined [her] as a person in many respects." He described his wife as "lost" because "she was an independent person who had taken care of herself." During its cross-examination, UMWA sought to demonstrate that Ms. Moore was not emotionally distressed because she engaged in her usual activities on the day she was terminated, and even journeyed abroad at a later date. Mr. Linder acknowledged that on the day of her termination, Ms. Moore "went to school." Ms. Moore continued to attend classes. She also traveled to China, a trip "coordinated through [CEP which] was actually paid for through a grant."
*341 Undoubtedly, mental anguish or emotional distress may be considered in awarding compensatory damages. See Daka, supra, 711 A.2d at 100. The evidence of Ms. Moore's emotional distress centers on how her termination from the UMWA affected her because of her deep devotion to and involvement in her career as a mine labor journalist, and her commitment to miners. This evidence is not as substantial as that in cases concerning a hostile working environment, see, e.g., Daka, supra, 711 A.2d at 100 ("the insulting behavior of [appellee's] supervisor and co-workers made him feel inadequate and inept"; appellee's "wife said that he suffered both mentally and physically in the weeks before he was fired"); Arthur Young & Co., supra, 631 A.2d at 358 (appellee was subjected to "some patently sexist comments," such as: "[S]he made enough for a woman"; "she should have been at home cooking"; and "she should be `meek and mild'"). The case before us focuses on discriminatory termination, not discrimination resulting from a hostile working environment. We are also mindful of "the respect accorded the [trial] judge's unique opportunity to consider the evidence in the living court-room context." Weinberg, supra, 518 A.2d at 994.
In light of the role of the trial judge, and the testimony given by Ms. Moore and her husband regarding the impact of her termination from the UMWA on her emotional well-being, we cannot say that the trial court abused its discretion in determining that the award of emotional distress damages was "`beyond all reason, or . . . so great as to shock the conscience.'" Wingfield, supra, 379 A.2d at 687. Accordingly, we sustain the judgment of the trial judge with respect to the award of compensatory damages, including emotional distress damages.

The Punitive Damages Award
UMWA contests the award of punitive damages to Ms. Moore, arguing that the award does not meet the standards set forth in Jonathan Woodner Co. v. Breeden, 665 A.2d 929 (D.C.1995), reh'g denied, 681 A.2d 1097 (D.C.1996) and Arthur Young & Co., supra. In Jonathan Woodner Co., we stated:
[T]o sustain an award of punitive damages, the plaintiff must prove, by a preponderance of the evidence, that the defendant committed a tortious act, and by clear and convincing evidence that the act was accompanied by conduct and a state of mind evincing malice or its equivalent.
Id. at 938 (citation omitted). In Arthur Young & Co., supra, we concluded that: "The legislative history of the DCHRA supports the view that the Council [of the District of Columbia] intended that plaintiffs bringing civil actions under the DCHRA be allowed to recover punitive damages in appropriate cases." 631 A.2d at 371. In Daka, supra, "we . . . explicitly h[e]ld that punitive damages are available in all discrimination cases under the DCHRA, `subject only to the general principles governing any award of punitive damages.'" 711 A.2d at 98 (quoting [Arthur Young & Co., supra], 631 A.2d at 372 (citation omitted)). "A showing of evil motive or actual malice is . . . required." Arthur Young & Co., supra, 631 A.2d at 372. We referenced an earlier decision, Vassiliades v. Garfinckel's, Brooks Brothers, Miller & Rhoades, Inc., 492 A.2d 580, 593 (D.C. 1985) where we declared: "The purpose of punitive damages is to punish a person for outrageous conduct which is wanton, reckless, or in willful disregard for another's rights." Arthur Young & Co., supra, 631 A.2d at 372.
While UMWA's behavior was discriminatory, the record before us lacks any showing, by clear and convincing evidence, of malicious, wanton, reckless or willful actions on the part of UMWA. The Daka case presented "a fairly close" issue as to punitive damages. Daka, supra, 711 A.2d at 99. Ms. Moore made no showing which approximates the humiliation and embarrassment to which the plaintiff in Daka was subjected, or the persistent ridicule which his supervisor and other employees heaped upon him, and management condoned. Id. Moreover, unlike Arthur Young & Co., the evidence introduced by Ms. Moore at her trial failed to "establish[] that supervisory personnel both participated in and otherwise condoned working conditions in which . . . [Ms. Moore was] subjected to [gender-based] comments on a *342 regular basis." 631 A.2d at 373. Indeed, the record before us is devoid of such comments, other than two. One was attributed to Mr. Stropp, which he denied, in the context of a discussion about another person, Lisa Parnell: "You know, Marat, you can't be a woman and be outspoken in this union." The other comment, reportedly made by Mr. Hawthorne, was: "We can't hire [Patty Devlin]. . . for a staff/writer position . . . because it would be another Marat problem." Even when the evidence is viewed in the light most favorable to Ms. Moore, it is insufficient to show, by clear and convincing evidence, that UMWA's "conduct was accompanied by the requisite degree of malice or evil motive to justify an award of punitive damages." Daka, supra, 711 A.2d at 99.[13] Therefore, we are constrained to reverse the award of punitive damages as a matter of law.
Accordingly, for the foregoing reasons, we affirm the trial court's judgment as to liability and compensatory damages; and reverse the judgment as to punitive damages.
Affirmed in part and reversed in part.
NOTES
[1] "Marat" is Ms. Moore's nickname.
[2] Later, Ms. Moore completed an evening Graduate Certificate Publications Specialist Program in 1990 at George Washington University, and earned an M.A. degree in 1995 from St. John's College (Annapolis, Maryland), Graduate Institute in Liberal Education.
[3] Initially, the mission of the CEP, which was established in the late 1970's, was to employ females in coal mines. Later, its mission was to form support groups for women miners through annual conferences. UMWA supported the CEP by, inter alia, granting paid leave for its members to attend the conferences.
[4] The January 10 memorandum apparently was written after Mr. Burton spoke to Ms. Moore on January 7 about an invitation sent by CEP to UMWA Vice President, Cecil Roberts, asking him to speak at the conference to be held at the Executive Inn. Ms. Moore informed Mr. Burton that the chair of the CEP board and the chair of the advisory committee had asked for a letter "to fully advise CEP of the problems that may result from the choice of [the Executive Inn] site [in Evansville]."
[5] Mr. Johnson was fired approximately one year later. Mr. Burton depicted him as having "a poor attitude" and "a terrible appearance."
[6] Two days earlier, Mr. Hawthorne had discussed with Ms. Moore Mr. Baker's transfer to another department, and his, Mr. Hawthorne's, authority to hire another staff person for the UMW Journal, and his expectation that the staff would receive a raise "in the very near future."
[7] The effective date of the termination was stated as February 16, 1994. Ms. Moore also was scheduled to receive 30 days severance pay.
[8] During his trial testimony, Mr. Stropp denied making this comment.
[9] We do not address UMWA's argument that a demand for reinstatement is a prerequisite to the award of front pay damages under the DCHRA. Even assuming a demand for reinstatement requirement, Ms. Moore's actions demonstrate that she sought to reverse her termination. She requested and was denied an exit interview with the President of UMWA, Mr. Trumka. In March 1994, she wrote to the Secretary-Treasurer of UMWA seeking to appeal her termination as discriminatory. She applied for the communication director's position in June 1994.
[10] Dr. Lurito's calculations are based on Ms. Moore's life and worklife expectancy; the salary she probably would have received on August 1, 1994 had she not been replaced by Mr. Zon; an annual salary escalation factor; an annual inflation rate; her salary differential; the present value of her projected earnings; and fringe benefits, such as vacation time to which she would have been entitled but for her termination.
[11] Dr. Lurito's calculations are based on a worklife expectancy both of 58.1 and 62.0 years of age.
[12] Ms. Moore was awarded $300,000 in compensatory damages. Dr. Lurito estimated that her lost income (back pay and front pay) amounted to $171,226 to $197,864. The remaining sum is approximately $100,000 to $129,000.
[13] When UMWA requested, at trial, that no punitive damages instruction be given to the jury, the trial court stated: "Looked at from Ms. Moore's perspective, it would appear that . . . one could construe some of these events [e.g., those surrounding the termination of Ms. Moore and the hiring of Mr. Zon] as reflecting, certainly discrimination. Whether it rises to the outrageous conduct completely beyond the pal[e] which is the setting for punitive damages, I'm . . . not sure."