**John D. CROLEY, Appellant/Cross–Appellee,**

v.

**REPUBLICAN NATIONAL COMMITTEE, et al., Appellees/Cross–Appellants.**

**Nos. 99–CV–482, 99–CV–398.**

District of Columbia Court of Appeals.

Argued May 11, 2000.

Decided Sept. 21, 2000.

---

Tom Watson for appellant/cross-appellee.

Robert Lynch for appellee/cross-appellant.

Before REID, GLICKMAN, and WASHINGTON, Associate Judges.

REID, Associate Judge:

In this personal injury action, brought by appellant/cross-appellee John D. Croley against appellees/cross-appellants the Republican National Committee ("the RNC") and others, the jury returned a $1,200,000.00 verdict in favor of Mr. Croley for assault, battery and negligence, including $600,000.00 for lost future earnings.[1] In response to a post-trial motion by the RNC and Mr. Jasper Mills, the trial court vacated the award of $600,000.00 for lost future earnings. On appeal, Mr. Croley challenges the decision of the trial court to vacate the award for lost future earnings. In addition, he claims that the trial court erred by: (1) not allowing the jury to consider his claim for punitive damages; and (2) excluding his head or brain injury claim. In their cross-appeal, the RNC and Mr. Mills contend that the trial court erred by not granting their post-trial motion for judgment on the assault, battery and negligence claims. They also argue that the trial court abused its discretion by failing to grant their post-trial motion for a new trial and remittitur.

We affirm the trial court's judgment in No. 99–CV–398, denying the appellees/cross-appellants' post-trial motions for judgment on Mr. Croley's assault, battery and negligence claims, and for a new trial or remittitur. In No. 99–CV–482, we affirm the trial court's judgment regarding

---

1. The jury verdict found the RNC and Jasper E.R. Mills, one of the men who assaulted Mr. Croley, liable for assault, battery and negligence.

punitive damages, and the exclusion of evidence concerning Mr. Croley's head or brain injury claim; but vacate its judgment pertaining to the award of lost future earnings and remand this matter with instructions to reinstate the $600,000.00 award for lost future earnings.

## FACTUAL SUMMARY

The record before us shows that on the evening of March 26, 1984, Mr. Croley exited his home located on Ramsey Court, in the District of Columbia, to take photographs of an overflowing trash dumpster belonging to the Capitol Hill Club which is located immediately adjacent to Ramsey Court, a public street, and the RNC office building. Due to ongoing health concerns on the part of Ramsey Court residents because of the poor maintenance of the dumpster, and its attraction of rodents, Mr. Croley decided to document its condition, and its immediate surrounding area, by taking photographs. He planned to present the photographs at an upcoming zoning hearing.

As Mr. Croley was taking photographs of the dumpster, he was approached by two RNC security guards, Mr. Mills and James E. Lyons. The two RNC security guards informed Mr. Croley that he was not permitted to engage in night time activities on Ramsey Court. Since Ramsey Court was a public street, Mr. Croley ignored the RNC security guards and continued to take photographs. At trial, Mr. Croley described the actions taken by the guards:

2. The GUH medical records indicate, in part, that Mr. Croley "was mugged Mon[day] evening, but can't recall trauma to chest, other than being thrown to ground."

3. The GUH medical records show the following entry: "eight days ago was mugged, and sustained some possible chest trauma."

4. Medical records from the Medical University of South Carolina contain the following notes, in part:
This 34–year–old white male was in his normal state of health until April, 1984,

As I was turning around to take another picture, Mr. Mills grabbed me and pulled me toward him. And then I—I don't remember anything, until I was on the pavement, with Mr. Mills standing over me. I was sort of on my side, curled up a little bit, and my left side. And Mr. Mills was standing over me, with one foot—I guess it would have been his left foot at my back, and his right foot at my chest. And then ... I started calling for the police....

After the police arrived and assisted him, Mr. Croley chose not to go to the hospital because he was "confused about being groggy, and [ ] just wanted to go home." However, a few days following the attack, Mr. Croley was taken to the Georgetown University Hospital ("the GUH") by a friend because of chest pains. As he stated at trial:

I remember I was sitting at a table in my house, and I remember reaching across for a phone, to make a phone call, and having excruciating pain right here in my chest. And it was very intense; it hurt a lot, and I didn't know why.

Mr. Croley was examined in an emergency room for possible chest trauma, and was released.[2] Several days later, he returned to the GUH for a follow-up visit relating to his chest pain. He was examined and released that same day.[3]

Approximately one year later, on April 25, 1985, after filing his personal injury lawsuit on March 26, 1985, Mr. Croley sought treatment at the Medical University of South Carolina due to his persistent chest pains.[4] Following his observation

when he was physically assaulted in Washington, D.C. He was seen in the [emergency room], and felt to have muscular skeletal chest pain; however, an EKG revealed T-wave inversion.... The above-named patient was seen as an out-patient at the Medical University Hospital on February 15, 1985.... The patient states that since that time he has had chest pain along the left sternal border, and radiating around the axillae. This is more or less constant, but it has been less for the past two months, until yesterday, when he came into Charleston,

and examination of Mr. Croley, Dr. Hendrix noted that:

> The chest pain, I'm sure, is muscular skeletal. He did suffer trauma to that area in April, 1984. And I believe the pain is certainly muscular skeletal in origin.

Five years later, on October 30, 1990, Dr. Gerald I. Shugoll, a cardiovascular specialist engaged by the RNC, examined Mr. Croley's chest area and concluded that:

> [Mr. Croley's] chest pain is typically chest wall in origin, and seems to be localized to the costochondral cartilage at the fourth, left junction, and can be reasonably attributed to the [March 26, 1984] assault that he suffered. Thus, there is no [ ] cardiovascular impairment sustained as a result of the March 26, 1984 incident, but his persistent chest wall pain can be reasonably related back to that [March 26, 1984] incident.

On March 8, 1994, Mr. Croley went to the Johns Hopkins University Medical School, again complaining of chest pains. Dr. Srinivasa Raja, a professor at the Medical School, examined Mr. Croley and stated that:

> Based on our examination as well as interviewing the patient, we felt that his systematology, at least relating to the anterior chest wall of pain, which was the main symptom that the patient complained or presented to us, could be explained by a chronic—a syndrome called chronic costochondritis.... We indicated to him that this appeared to be

more of a problem related to the chest wall than the heart.

In his report, Dr. Raja concluded, to a reasonable degree of medical certainty, that Mr. Croley's chest injury was the result of his March 26, 1984 assault.[5]

In addition to his physical injuries, in 1993 Mr. Croley was also diagnosed with Post Traumatic Stress Disorder ("PTSD"). As a result of this condition, he began to receive Social Security Disability Insurance payments. An affidavit from Dr. Mary Beth Williams, a licensed clinical social worker, explained that:

> One of the most significant parts of this is that [Mr. Croley] feels as if [the attack is] recurring again, whenever he's had the physiological pain associated with the chest injury. And this chronic pain is a constant, constant reminder that he's had of the events that's happened. And when he has that pain— and I've seen this happen in my office as well—that you can see him almost, what I would call, "zone out," and I have to bring him back into the room ... He also has reported to me that after it happened he would do anything he could to stay out of the way of the alley, and would walk blocks out of his way just so he didn't have to go through that area, because it was reminiscent of [the attack].

Based upon her observations, Dr. Williams concluded that the cause of Mr. Croley's PTSD is the 1984 assault that he suffered on Ramsey Court.[6] Dr. Williams also

---

by air; and this was aggravated by carrying his luggage.... There is some tenderness along the left sternal border and of the third, fourth and fifth ribs in that area.

5. Mr. Russell Orban and his wife were friends of Mr. Croley at the time of the 1984 assault. At trial, Mr. Orban testified that he saw Mr. Croley on the night after the assault. Mr. Croley "was pretty banged up." He "had ... [a] red mark, a welt or an abrasion on his chest." He described the abrasion as "semicircular and shaped round, like an ark, in the center of his chest."

6. Mr. Orban, and Ms. Vincette Felice Goerl, a woman whom Mr. Croley dated until January 1992, described Mr. Croley's behavior before and after the March 26, 1984 assault. Mr. Orban stated that before the assault, Mr. Croley was "a sharp, bright business man ... [who was] detail oriented." In addition, "[h]e had a very good, quick, able mind and was a friendly person, a lot of fun to be around." Ms. Goerl testified that after the assault, Mr. Croley was not as focused. He was "seemingly more frustrated by his inability to give more time to [his] work." He was not as positive in his attitude, was "less so-

opined that, due to his condition, "[Mr. Croley's] participat[ion] as a party and/or witness in the trial of his case would present a significant risk to [his] life."

On September 1, 1995, Mr. Croley was examined for a potential head injury by Dr. Kenneth Plotkin, a board certified neurologist at the Georgetown Medical Center. Dr. Plotkin ordered an MRI. After completing his study of Mr. Croley, Dr. Plotkin diagnosed him with a brain injury that he deemed to be consistent with a traumatic blow to the head. Appellees/cross-appellants requested an independent medical examination ("IME" or "examination") of Mr. Croley by Dr. Charles H. Epps, Jr. Mr. Croley sought a protective order on February 18, 1997, claiming that he had already agreed to an examination by Dr. Bruce Ammerman. On May 13, 1997, and October 6, 1997, the trial court ordered Mr. Croley to appear for the IME by Dr. Ammerman. After further delay, during which Mr. Croley asked for information relating to "the manner, conditions and scope" of the neurological exam, and after Dr. Williams submitted an affidavit on February 3, 1998, declaring that Mr. Croley was suffering from extreme anxiety about the IME, the trial court issued an order on February 20, 1998, granting appellees/cross-appellants' motion to preclude the presentation of evidence at trial, by Mr. Croley, pertaining to his alleged head or brain injury claim.[7] The order stated, in part:

> Despite the clear instructions of the court, the plaintiff has not yet submitted to an IME, and only recently raised the purported reason why he has failed to do so. [footnote omitted].
>
> Because the defendant is entitled to have the IME conducted to adequately defend against this action, and having the IME conducted as now proposed by the plaintiff would inevitably delay the

commencement of the trial, [footnote omitted] the court is reluctantly compelled to preclude the introduction of any evidence regarding the plaintiff's alleged head injury during the trial of this case [footnote omitted].

During trial on his assault, battery, negligence, and intentional infliction of emotional distress claims, Mr. Croley offered extensive testimony concerning the negative impact that the assault by Mr. Mills and Mr. Lyons had on his overall future. As an undergraduate student at Oklahoma State University, Mr. Croley regularly made the "President's List of Distinguished Students," with the exception of his final semester when he made "one 'B'." Immediately following his graduation from Oklahoma State, he entered the Harvard Business School, and graduated with an MBA in 1976. After his graduation, until the time of the assault in 1984, Mr. Croley held numerous consulting positions with various firms or corporations. He specialized in what was then a relatively new area, "business computerization." He was employed as a consultant with the "Management Analysis Center," a consulting firm. Upon leaving that position, Mr. Croley became a consultant for "1st Data Corporation," and began work for the United States Senate's "Computerized Automated Correspondence Management System." He developed "a prototype system ... to move [the Senate] from answering their correspondence by typewriters and magnetic card typewriters to using computers to manage their correspondence." Following his work with the Senate, Mr. Croley served as a consultant to the H.J. Heinz Company to "determin[e] their fiscal distribution and logistics policies, corporate-wide, throughout North America."

In 1979, Mr. Croley began a "time-sharing" business in the District, the "Croley

---

cial" and his surroundings went from "neat" to "cluttered."

**7.** On August 17, 1998, the trial court denied the "plaintiff's motion to reconsider the order prohibiting introduction of any evidence regarding plaintiff's claim for head injury based on plaintiff's additional psychiatric treatment and therapy."

Computer Company"; and also became active in other endeavors. His computer company provided various membership organizations with interactive computerized assistance for the maintenance of current proprietary membership data. Later, he sold the time-sharing assets of the company[8] and began "consulting and leasing computers and commodities" to various entities, including the Environmental Protection Agency ("the EPA") and the George Washington University ("GWU"). His eighteen month contract with the EPA, for which he was awarded $360,000.00, began in 1982 and ended in 1983. For his forty-eight month contract with GWU, which commenced also in 1982, he was awarded $172,000.00.[9] Mr. Croley testified that although he was the sole shareholder of the company, he "didn't draw a salary" because he "always re-invested the earnings into the company." He relied upon real estate that he owned near Harvard Square in Massachusetts to "provide[ ] a positive income [to] pa[y] for [his] living expenses." The Massachusetts property was purchased with consulting fees that he received. Furthermore, his computer company paid his living expenses while he was in the District, and eventually purchased a house for him in the District. He acknowledged on cross-examination that for the years 1983 through 1985, his "personal earnings were not extensive," but he asserted that "some of the corporations did okay." In addition to his business pursuits in the District, Mr. Croley was involved with, or a member of the Capital Hill Restoration Society; the D.C. Zoning Commission; the D.C. Recreation Department; the D.C. Master's Swimming Team; and the Harvard Business School Alumni Club.

After a seven day trial in October 1998, the jury returned a verdict in favor of Mr. Croley in the amount of $1,200,000.00. In response to post-trial motions filed by the RNC and Mr. Mills, on February 25, 1999, the trial court issued an order vacating the $600,000.00 award for "future loss damages," but denied the request for remittitur and the motion for a new trial.

## ANALYSIS

### *The Lost Future Earnings Issue*

On appeal, Mr. Croley argues that the jury's $600,000.00 award for lost future earnings should be reinstated because he presented sufficient evidence at trial illustrating that "[p]rior to the assault, he was a successful entrepreneur in the field of business consulting." He relies, in part, on evidence pertaining to his contracts with EPA and GWU. He also asserts that: "The alternate model of earnings presented by Dr. [Thomas Charles] Borzilleri was appropriate." The RNC and Mr. Mills support the trial court's decision to vacate the $600,000.00 award for lost future earnings "because Mr. Croley did not present *any* evidence of personal earnings." (Emphasis supplied).

■ "In the District of Columbia, the primary purpose of compensatory damages in personal injury cases 'is to make the plaintiff whole.'" *District of Columbia v. Barriteau*, 399 A.2d 563, 566 (D.C.1979) (quoting *Kassman v. American Univ.*, 178 U.S.App.D.C. 263, 267, 546 F.2d 1029, 1033 (1976)) (other citations omitted). Thus, "[a] claim for damages for loss of future earnings resulting from injuries suffered due to the negligence of others is a cognizable element of damages during the life of the injured party." *Moattar v. Foxhall Surgical Assocs.*, 694 A.2d 435, 438 (D.C. 1997) (citing *Barriteau, supra*, 399 A.2d at 567). However, such damages must be "properly proved at trial." *Barriteau, supra*, 399 A.2d at 567. Generally, " '[w]hile

---

**8.** Mr. Croley never revealed the precise dollar amount that he gained from this assets sale.

**9.** The lease between the company and GWU, which was introduced into evidence, called for quarterly payments in the amount of $10,800.00 for the period December 1, 1982 through November 30, 1986.

damages are not required to be proven with mathematical certainty, there must be some reasonable basis on which to estimate damages.'" *Estate of Underwood v. National Credit Union,* 665 A.2d 621, 642 (D.C.1995) (quoting *Romer v. District of Columbia,* 449 A.2d 1097, 1100 (D.C.1982)). As we stated in *Curry v. Giant Food Co. of the District of Columbia,* 522 A.2d 1283 (D.C.1987):

> The rule is that recovery of damages based on future consequences of a tort is available only if such consequences are reasonably certain. Unless there is nonspeculative evidence demonstrating that future suffering, additional medical expense, and loss of income will occur, the question should not be submitted to the jury.

*Id.* at 1291 (citing *American Marietta Co. v. Griffin,* 203 A.2d 710, 712 (D.C.1964)) (other citation omitted).

■ Since "arriving at a [reasonable] sum representing future loss of earnings often involves a complicated procedure," *Barriteau, supra,* 399 A.2d at 568, "the trier-of-fact must have evidence pertaining to the age, sex, occupational class, and probable wage increases over the remainder of the working life of the plaintiff." *Id.* Furthermore, it is well settled that '"the task of projecting a person's lost earnings lends itself to clarification by expert testimony because it involves the use of statistical techniques and requires a broad knowledge of economics."' *Barriteau, supra,* 399 A.2d at 568 (quoting *Hughes v. Pender,* 391 A.2d 259, 262 (D.C. 1978)). Indeed, "where the existence of substantial future economic loss becomes an issue, the use of expert testimony likely would be necessary since seldom will lay witnesses possess the requisite background to testify on a matter such as this—one not likely to be within the common knowledge of the average lay [person]." *Id.* at 569.

■ In determining whether there was sufficient evidence to sustain a lost future earnings claim, "we must view the evidence in the light most favorable to appellant." *Estate of Underwood, supra,* 665 A.2d at 643 (referencing *Sere v. Group Hospitalization, Inc.,* 443 A.2d 33, 38 (D.C.), *cert. denied,* 459 U.S. 912, 103 S.Ct. 221, 74 L.Ed.2d 176 (1982)); *see also Bond v. Ivanjack,* 740 A.2d 968, 974 (D.C.1999); *Curry, supra,* 522 A.2d at 1291. Moreover, we will sustain the trial court's ruling admitting or excluding expert testimony about lost future earnings "unless a clear abuse of discretion is shown." *Hughes, supra,* 391 A.2d at 262 (citing *Ohio Valley Constr. Co., Inc. v. Dew,* 354 A.2d 518, 522 (1976)) (other citation omitted). However, expert testimony that is "based on mere speculation or guesswork," *Morgan v. Psychiatric Inst. of Washington,* 692 A.2d 417, 426 (D.C.1997) citing *Romer, supra,* 449 A.2d at 1100)), or that "[is not] based upon evidence in the record," *Barriteau, supra,* 399 A.2d at 569, "can[not] provide a rational basis for the jury's determination of an individual's future earnings...." *Hughes, supra,* 391 A.2d at 263; *see also Morgan, supra,* 692 A.2d at 426.

In this case, Mr. Croley presented evidence concerning his then recent contracting and consulting work prior to his assault, including details about an eighteen month $360,000.00 contract with EPA, and a forty-eight month lease with GWU for $172,000.00, payable in quarterly installments of $10,800.00. He candidly admitted that his "personal earnings were not extensive," because he "always re-invested the earnings into [his computer] company." He stated, however, that his computer company paid him expenses and purchased a home for him in the District. In addition, he presented the testimony of Dr. Borzilleri, an expert in economics, who attempted to "approximate[ ] the kind of money that [Mr. Croley] would have been able to make over the course of his lifetime had he not been injured." Since Dr. Borzilleri did not "have a lot of background, or a lot of statistical information, or a lot of history on Mr. Croley," he "essentially look[ed] at the statistical data and sa[id],

on average[,] here's what ... a person [of Mr. Croley's age] with a M.B.A. from Harvard might be expected to earn over the course of their work lives." He did not know whether Mr. Croley had "any income, salary, [or] expenses that were paid" prior to his injury, and further, admitted that he had "no wage history" for Mr. Croley. Dr. Borzilleri testified that he was aware of the computer company that Mr. Croley established in 1979, but did not have any "income tax returns," "payroll records," or "earnings statements" with regard to this company. Dr. Borzilleri stated: "I know he was doing something during the course of the year with his computer corporation. But I don't know if it made any income for him or if it paid expenses for him; I just don't have any financial data on it." Consequently, Dr. Borzilleri's opinion as to the lost future earnings issue was predicated upon Mr. Croley's "date of birth, the fact that he had an M.B.A., a Master's in Business Administration from Harvard University; and ... statistical data ... relative to both Harvard MBA's and basic information that's collected by the United States government concerning the earnings of males with a master's degree, by age." Dr. Borzilleri stated his conclusions as follows:

I estimate that the present value of [Mr. Croley's] future losses—If we treat him as the average person in the United States, with a Master's Degree—is approximately two million dollars. That is, over the course of the lifetime a person of his age, with a Master's Degree would be expected to earn about two million dollars ... from 1984 on out, for the rest of their life work. On the basis of being a Harvard graduate, I estimate that number would be closer to three million dollars. I've got 2.9 million dollars, because Harvard graduates earn substantially more money than do—with an M.B.A.—than do people ... with other kinds of Master's Degree's.

The judge who presided over the trial pertaining to Mr. Croley's complaint was reluctant to permit Dr. Borzilleri to testify, essentially because he considered the economist's proposed testimony, which Mr. Croley's counsel proffered prior to his testimony, to be "speculative." However, the judge concluded that he was bound by the ruling of another judge, earlier in the case, that Dr. Borzilleri's testimony would be admitted. Nevertheless, on February 23, 1999, in response to appellees/cross-appellants' post-trial motion for judgment and/or for a new trial or remittitur, the trial court concluded that the $600,000.00 award rendered by the jury for lost future earnings was not supported by the evidence presented at trial, and accordingly vacated that amount. As the trial court stated:

The plaintiff did not offer any evidence, through testimony or otherwise, upon which the jury could assess what the defendant's earnings had been before the incident. Dr. Borzilleri did not base his testimony on such evidence either. Rather, Dr. Borzilleri based his opinion that the plaintiff would acquire future earnings during his work-life of approximately three million dollars solely on the fact that he acquired a masters degree in business administration ("MBA") from Harvard University. Although the plaintiff is an MBA graduate from Harvard, he obviously was not achieving monetarily at the level of his counterparts prior to the events that caused this action to be filed, if Dr. Borzilleri's testimony is accurate. That being the case, the plaintiff is not entitled to recover what the universe of Harvard MBA graduates of the plaintiff's age are expected to earn during their work-life. The plaintiff is only entitled to recover what the record supports he is reasonably expected to earn.

We recognized in *Barriteau, supra,* that "arriving at a [reasonable] sum representing future loss of earnings often involves a complicated procedure." *Barriteau, supra,* 399 A.2d at 568. This is particularly true in this unique case which involved a

relatively recent graduate of the Harvard Business School who, at the time of his injuries, had begun to establish himself as a consultant and self-employed expert in the then new field of business computerization. Mr. Croley had elected to put his earnings into a computer company which he established, and in which he was the sole shareholder, and to subsist on proceeds from a Massachusetts real estate purchase and expenses paid to him by his computer company. Thus, at the time of his injury and lawsuit, he did not have a traditional record of personal earnings. Nonetheless, through his testimony and documentary evidence, he demonstrated his ability to generate business, covering a four year period, from a federal agency and a university in an amount totaling $532,000.00.

 "In determining the loss of earnings or earning capacity of a self-employed individual or partner, consideration may be given to several factors, including loss of profits from the business, the cost of substitute labor, the value of the plaintiff's services, and plaintiff's draw against profits." Marilyn Minzer, *et al.*, DAMAGES IN TORT ACTIONS § 10.35[1], vol. 2 (Matthew Bender & Co.2000) (footnotes omitted). Since Mr. Croley put his earnings into his computer company and was the sole employee of the company, under the circumstances, the best measure of his lost future earnings would be the value of his services. This value could be ascertained in two ways: (1) the amount of business he was able to obtain for his company, that is, the $532,000.00 covering a four year period, and (2) the testimony of an economic expert concerning what a person of his educational background, sex, and age would have earned had he not been injured on March 26, 1994.

Significantly, when it discounted the testimony of Dr. Borzilleri and vacated the jury's $600,000.00 award for lost future earnings, the trial court did not focus on the expert's methodology, his assumptions, the jury's conclusions in relation to the calculations of the economist, and the other evidence of record as to the value of Mr. Croley's services to his business computerization endeavors. Dr. Borzilleri estimated Mr. Croley's lost future earnings by:

(1) Determining from a statistical table in a document called "Money Income in the United States, 1984," that a person in Mr. Croley's age bracket who holds a Master's degree would have earned approximately $32,000 in 1984, the year of his injury.

(2) Considering a BUSINESS WEEK MANUAL showing the median starting pay for a Harvard Business School graduate in 1997.

(3) Applying assumptions made by the Social Security Administration in its annual SOCIAL SECURITY TRUSTEE's REPORT to ascertain "earnings growth rates."

(4) Assuming that Mr. Croley would work to age 65, and reducing the number of his remaining work years by a "work life expectancy" factor to account for breaks in employment.

(5) Calculating the amount that Mr. Croley would have paid in income taxes (approximately twenty-five to thirty percent of the estimated future earnings), and also making an assumption regarding fringe benefits by using the United States Chamber of Commerce's average benefit rate of 29.6 percent.[10]

(6) Based on data from the federal government's Pension Benefit Guarantee Corporation, determining the "present value" of Mr. Croley's future earnings, taking into consideration the possibility of an early death.

Neither the RNC nor Mr. Mills presented any expert testimony at trial challenging the methodology used by Dr. Borzilleri in this rather unique case. Nor do they

---

**10.** Under this methodology, Mr. Croley would have earned $59,896.00 in 1996, after taxes; and $74,997.00 in the year 2002, after taxes.

attack the methodology on appeal. Instead, they contend that: "Dr. Borzilleri did not have a proper factual foundation on which to base his projections for Mr. Croley's future earnings." However, there is nothing in the record before us indicating that the "data" discussed by Dr. Borzilleri is not "of a type reasonably relied upon by experts in [his] particular field in forming opinions or inferences" on the issue of Mr. Croley's lost future earnings. *See* Fed. R.Evid. 703. Nor is there anything which suggests that the jury unreasonably interpreted Dr. Borzilleri's testimony, or the other evidence presented in the case. Indeed, the jury obviously took into consideration the $532,000.00 Mr. Croley generated for his computer company in the early 1980's, and reduced Dr. Borzilleri's work life calculations for a person of Mr. Croley's age who holds either a Harvard M.B.A. or a general Master's degree, from $2.9 million and $2 million, respectively, to $600,000.00, a substantial reduction of $2.3 million and $1.4 million, respectively. As Mr. Croley argues, this reduction translates into "a conservative [annual] award" of approximately $35,000.00 from the date of trial to his 65th birthday.

The parties do not cite any case that is squarely in accord with the one before us. Nor have we been able to find such a case. Mr. Croley relies mainly on *Forman v. Korean Air Lines Co., Ltd.,* 318 U.S.App. D.C. 6, 84 F.3d 446 (1996); *Athridge v. Iglesias,* 950 F.Supp. 1187 (D.D.C.1996); and *Hughes, supra.* Both *Athridge* and *Hughes* involved minors who had established no work history at the time of injury (*Athridge*) and death (*Hughes*); and testimony by an economic expert.[11] In this case, Mr. Croley is not a minor and had worked for some seven to eight years prior to his injuries. The court in *Forman, supra,* permitted plaintiff's expert to "calculate[ ] [Ms.] Forman's future earnings ... based on the average earnings of a college-educated female of her age," because she "had only recently received a green card" and higher paying positions had not previously been available to her. *Id.* at 449–50.

 The parties cite no case that fits the factual and procedural circumstances of Mr. Croley's, and we have been unable to find one. Nonetheless, there are critical guiding legal principles for the resolution of the lost future earnings issue which may be distilled from cases concerning lost future earnings: (1) the plaintiff has the burden of demonstrating, with reasonable certainty, that he has sustained a loss of future earnings or earning capacity,[12] *see Moattar, supra,* 694 A.2d at 439; and (2) sufficient evidence must be presented to preclude jury speculation or conjecture, *see Morgan, supra,* 692 A.2d at 426. In applying these critical guiding principles to the case before us, we are cognizant that: "Proof of damages by a self-employed person is sometimes difficult to reduce to specifics...." *Sears, Roebuck and Co. v. Facciolo,* 320 A.2d 347, 349 (Del.1974). Thus, in a case, such as the instant one, involving a self-employed consultant in the relatively new

11. We said in *Hughes, supra:*

> In a case such as this, involving a person who has not yet made his choice of livelihood, future lost earnings must be determined on the basis of potential rather than demonstrated earning capacity. That potential must be extrapolated from individual characteristics, such as age, sex, socio-economic status, educational attainment, intelligence and dexterity.

391 A.2d at 263 (citation omitted). Similarly, the expert in *Athridge, supra,* based his testimony as to the minor plaintiff's "permanent diminution in ... earning capacity" on "the demonstrated earning capacity of someone of plaintiff's race, sex, age, and educational level." *Id.* at 1192.

12. The trial court instructed the jury that Mr. Croley "must prove his damages with reasonable certainty," and that the jury could award damages for "any lost earnings or earning capacity that [he] may incur in the future." Courts do not always agree on the distinction, if any, between lost earnings and lost earning capacity, or lost future earnings and lost future earning capacity. *See* Minzer, *et al., supra,* § 10.00; § 10.14.

field of business computerization, who has demonstrated a capacity to generate business by obtaining contracts from governmental and educational entities, "it is not improper for a calculation [of lost future earnings] to be based upon earning potential rather than demonstrated earning capacity." *Butera v. District of Columbia*, 83 F.Supp.2d 25, 35 (D.D.C.1999) (citing *Hughes, supra,* 391 A.2d at 263).[13] However, as in this case, it is helpful if the trial record contains some evidence of particular contracts or business (here, the EPA and GWU contracts) obtained through the personal efforts of the self-employed consultant, prior to the date of injury. In addition, any expert testimony concerning future earning capacity must not be "speculative," or "based on unrealistic assumptions regarding the plaintiff's future employment prospects." *Boucher v. U.S. Suzuki Motor Corp.*, 73 F.3d 18, 21 (2d Cir.1996) (citation omitted). In that regard, nothing in the record before us indicates that the methodology used by Dr. Borzilleri to calculate Mr. Croley's lost future earnings was speculative, or based on unrealistic assumptions. Dr. Borzilleri provided detailed information concerning his methodology, and set forth assumptions predicated on federal and business documents. He presented options based on a person of Mr. Croley's sex and age holding a general Master's degree, and a Harvard Master's degree in business administration. The RNC and Mr. Mills had an opportunity to cross-examine Dr. Borzilleri on his methodology and his assumptions.

■ Accordingly, we conclude that the record before us reflects "some reasonable basis on which to estimate damages." *Estate of Underwood, supra,* 665 A.2d at 642 (quoting *Romer, supra,* 449 A.2d at 1100). Moreover, it is clear from the record that "the future consequences of [the] tort [against Mr. Croley] are reasonably cer-

tain." *Curry, supra,* 522 A.2d at 1291 (citing *American Marietta Co., supra,* 203 A.2d at 712). Testimony from Mr. Croley, and medical testimony not only from Mr. Croley's own doctors, but also from the expert hired by the RNC, established the causal connection between the assault committed on Mr. Croley by the RNC and Mr. Mills on March 26, 1984, and Mr. Croley's injuries, as well as his subsequent inability to resume his normal work patterns. Furthermore, it is reasonably certain from the record that the value of Mr. Croley's future services would have amounted to at least $35,000.00 per year, but for the assault and resulting injuries, and that the jury award of lost future earnings did not result from speculation or conjecture. Rather, the jury took into consideration not only the testimony of Dr. Borzilleri, but also weighed that testimony in light of the $532,000.00 in EPA and GWU contracts generated by Mr. Croley in the two years prior to his injury. Therefore, viewing the evidence in the light most favorable to Mr. Croley, *see Estate of Underwood, supra,* 665 A.2d at 643 (referencing *Sere, supra,* 443 A.2d at 38), we are constrained to conclude that the trial court abused its discretion by vacating the jury's award of $600,000.00 in favor of Mr. Croley for lost future wages.

### The Punitive Damages Issue

Mr. Croley maintains that the trial court committed error by not allowing the jury to consider his claim for punitive damages. The trial court deferred the punitive damages issue until after the jury rendered its verdict. After the jury's verdict, the trial court refused to submit the question of punitive damages to the jury because the jury found the RNC and Mr. Mills not liable on Mr. Croley's claim of intentional infliction of emotional distress, and because the elements of this intentional tort include: "extreme and outrageous conduct

---

**13.** In *Butera, supra,* the plaintiff's son was killed while working as an undercover operative for the Metropolitan Police Department.

on the part of the defendants," "conduct committed by the defendants that was intentional or reckless," and "the infliction by the defendants of severe emotional distress on the plaintiff." The RNC and Mr. Mills agree that since the jury did not find them liable for intentional infliction of emotional distress, there was no basis for an award of punitive damages.

■ "[W]e have repeatedly recognized that a plaintiff's request to submit the issue of punitive damages to the jury is governed by the normal test for a triable issue of fact: whether there was evidence from which a jury reasonably could find the required malicious intent or willful disregard of another's rights." *King v. Kirlin Enterprises, Inc.,* 626 A.2d 882, 884 (D.C.1993) (citing *Robinson v. Sarisky,* 535 A.2d 901, 907 (D.C.1988)). Furthermore, in *Jonathan Woodner Co. v. Breeden,* 665 A.2d 929, 938 (D.C.1995), *reh'g denied,* 681 A.2d 1097 (D.C.1996), we stated:

[T]o sustain an award of punitive damages, the plaintiff must prove, by a preponderance of the evidence, that the defendant committed a tortious act, and by clear and convincing evidence that the act was accompanied by conduct and a state of mind evincing malice or its equivalent.

We also said in *United Mine Workers of America, Int'l Union v. Moore,* 717 A.2d 332 (D.C.1998), that to prove punitive damages, "[a] showing of evil motive or actual malice is ... required." *Id.* at 341(citing *Arthur Young & Co. v. Sutherland,* 631 A.2d 354, 372 (D.C.1993)). *See also Jemison v. National Baptist Convention,* 720 A.2d 275, 285–86 n. 10 (D.C.1998) (A claim for punitive damages requires a showing of "fraud, ill will, recklessness, wantonness, oppressiveness, willful disregard of the plaintiff's rights, or other circumstances tending to aggravate the injury" (citation omitted)). In considering whether the issue of punitive damages should have been submitted to the jury, we must "view the evidence in the light most favorable to the party seeking punitive damages ... bear-

ing in mind that the requisite state of mind ... may be inferred from all the facts and circumstances of the case." *King, supra,* 626 A.2d at 884 (quoting *Robinson, supra,* 535 A.2d at 906) (internal quotations omitted).

■ We need not decide whether a claim for punitive damages is barred when a jury finds no liability for intentional infliction of emotional distress but liability is found on other intentional torts, because we are satisfied that Mr. Croley did not present clear and convincing evidence to satisfy the elements of punitive damages, and no reasonable inference that the elements were met may be made on the record in this case. The District of Columbia standard jury instruction on punitive damages provides, in relevant part:

You may award punitive damages only if the plaintiff has proved with clear and convincing evidence:

(1) that the defendant acted with evil motive, actual malice, deliberate violence or oppression, or with intent to injure, or in willful disregard for the rights of the plaintiff;

AND

(2) that the defendant's conduct itself was outrageous, grossly fraudulent, or reckless toward the safety of the plaintiff.

A review of the record and testimony in this case reveals no evidence satisfying all of the elements of punitive damages. At trial, Mr. Croley testified he had complained to the police about parking by the RNC on Ramsey Court and signs that the RNC had placed on the RNC building saying, "Parking by permit only." In January 1984, several months before the March 26, 1984 assault, a fuel oil truck trying to make a delivery to Mr. Croley's house could not get through because of RNC cars parked on Ramsey Court, "people from the [RNC]" refused to move the cars. On at least one occasion when a police officer arrived in response to Mr. Croley's complaint, Mr. Mills was called

out and asked to produce the permit for the "parking by permit only" signs. Mr. Mills refused to produce the permit and, later, a District of Columbia official apparently ordered the signs to be removed. In recounting the disagreement with Mr. Mills about parking, Mr. Croley mentioned no personal encounter with Mr. Mills that manifested "outrageous" or "reckless" conduct "toward [his] safety" prior to the assault. Nor did he mention any heated words or derogatory comments uttered by Mr. Mills or Mr. Lyons before the assault on March 26, 1984. After detailing how he went outside on Ramsey Court to take pictures of the dumpster, the condition of the surrounding area, and Mr. Mills' statement that he could not engage in any activity on Ramsey Court, Mr. Croley described the assault on him in the following words:

> As I was turning around to take another picture, Mr. Mills grabbed me and pulled me toward him. And then I—I don't remember anything, until I was on the pavement, with Mr. Mills standing over me. I was sort of on my side, curled up a little bit, and my left side. And Mr. Mills was standing over me, with one foot—I guess it would have been his left foot at my back, and his right foot at my chest. And then I—when I—I was a little—I started calling for the police . . .

This account is devoid of comments or mention of gestures by Mr. Mills or Mr. Lyons which would satisfy the requirements for an award of punitive damages. Although the jury could infer, from Mr. Croley's recitation of the March 26 events, deliberate and intentional conduct by Mr. Mills and Mr. Lyons resulting in the assault and battery of Mr. Croley, the required showing of entitlement to punitive damages is more stringent and must rise to clear and convincing evidence. The jury could reasonably infer from Mr. Or-

ban's and Mr. Croley's testimony that Mr. Mills had placed his foot on Mr. Croley's chest after he was thrown to the ground and had left a "red mark" or an "abrasion" on his chest, but nothing in either man's testimony shows, by clear and convincing evidence, that this act satisfied the requirements for the award of punitive damages. *See United Mine Workers, supra,* 717 A.2d at 341–42. Based on our review of the record, we are satisfied that the trial court did not err in refusing to submit the issue of punitive damages to the jury, since as a matter of law Mr. Croley was not entitled to such damages.[14]

### The Issue of the Head or Brain Injury Claim

Mr. Croley contends that the trial court erred by excluding his head or brain injury claim as a sanction for his failure to meet a discovery deadline. The RNC and Mr. Mills argue that Mr. Croley's failure to appear for the scheduled and agreed upon IME by Dr. Ammerman was tactical and "willful," and that "the trial court [had] no alternative but to exclude his brain injury claim."

The record before us does not appear to be complete with respect to Mr. Croley's head or brain injury claim, which apparently was made some time after September 1, 1995 when Dr. Plotkin of the Georgetown Medical Center examined Mr. Croley and concluded that he had sustained a brain injury consistent with a traumatic blow to the head. On February 13, 1997, counsel for the RNC and Mr. Mills wrote to the then attorney for Mr. Croley requesting that Mr. Croley contact Dr. Ammerman "to arrange for an independent medical examination as soon as possible." The parties held a pretrial conference with the trial court (the Honorable Lee Satterfield) on May 13, 1997, and Mr. Croley was ordered to "submit to an IME

14. Given our conclusion regarding punitive damages, we need not consider Mr. Croley's arguments that the trial court should: (1) take judicial notice of Federal Election Commis-

sion documents relating to the annual receipts of the RNC, and (2) permit the jury to consider evidence concerning the cost and duration of his litigation.

by June 30, 1997." Mr. Croley did not comply with the order. On August 20, 1997, the RNC and Mr. Mills filed a motion to dismiss Mr. Croley's lawsuit or to prohibit the introduction of evidence pertaining to the head or brain injury claim. The trial court signed an order on October 2, 1997, granting the motion in part and denying it in part. Judge Satterfield ordered Mr. Croley to submit to the examination within twenty days of the docketing of his order; if he failed to comply, he would be barred from introducing evidence on his head injury claim.

Between October 21, 1997 and January 8, 1998, counsel for the respective parties exchanged correspondence regarding the court ordered examination by Dr. Ammerman. In essence, Mr. Croley demanded clarification regarding the "manner, conditions, and scope" of the examination, and the RNC and Mr. Mills pressed for Mr. Croley to appear for the IME. The RNC and Mr. Mills filed a renewed motion on January 15, 1998 to dismiss the lawsuit and/or to preclude the introduction of any evidence relating to Mr. Croley's head or brain injury. In response, on January 27, 1998, Mr. Croley lodged a motion to compel the RNC and Mr. Mills to provide information concerning the manner, conditions, and scope of Dr. Ammerman's examination. The January 28, 1998 response of the RNC and Mr. Mills detailed the information about the examination that had been provided to Mr. Croley in November 1997.

Mr. Croley filed a February 3, 1998 supplemental reply in which he declared that on January 28, 1998, he met with his certified trauma specialist, Dr. Mary Beth Williams, and that the examination by Dr. Ammerman had been scheduled for March 2, 1998. Trial on Mr. Croley's complaint was to begin on that date. An attached affidavit from Dr. Williams pointed out that she had been treating Mr. Croley since 1993 for "a number of psychological abnormalities[,] including depression, extreme anxiety, difficulty in concentration, sleep disorders, hypervigilance, tunneling, withdrawal, and traumatic amnesia." She stated that she saw Mr. Croley on January 28, 1998, and "found [him] to be suffering from extreme anxiety about the [examination] by Dr. Ammerman." The trial court (the Honorable Reggie B. Walton) signed an order on February 20, 1998, denying the RNC's and Mr. Mills' motion to dismiss the lawsuit, but granting their motion to preclude Mr. Croley from presenting evidence concerning his head or brain injury claim. The trial court issued a separate order on the same day denying Mr. Croley's motion to compel the RNC and Mr. Mills to provide information about the manner, conditions and scope of Dr. Ammerman's examination. Subsequently, on February 25, 1998, counsel for Mr. Croley moved for a temporary stay of the proceedings and submitted an affidavit from Dr. Williams stating that Mr. Croley had been admitted "to Dominion Hospital, a psychiatric Hospital in Falls Church, Virginia" because of a substantial increase in Mr. Croley's anxiety, and opining that "Mr. Croley was seriously embarking on the initial stages of contemplating suicide." After repeating his psychological abnormalities, she expressed the opinion that he suffered from PTSD, and added:

> Based on my education, training, and 26 years of experience specializing in stress reactions, as well as my 10 years as a specialist in treating persons suffering from Post Traumatic Stress Disorder, it is my professional opinion that Mr. Croley is currently suffering from a mental disability and that at this time having to participate as a party and/or witness in the trial of his case would present a significant risk to Mr. Croley's life.

Mr. Croley required six months of therapy, and trial was rescheduled for October 19, 1998. In response to Mr. Croley's July 9, 1998 motion for reconsideration of the trial court's order excluding evidence pertaining to Mr. Croley's alleged head injury, and the opposition to the motion, Judge

Walton denied reconsideration on August 17, 1998, concluding:

> The history of this case convinces the court that granting the plaintiff's motion would only further delay the resolution of this case, which at this point is approximately 13 years old. And the plaintiff has not presented to the court anything of substance that causes it to believe that he would now undergo the [examination]. Without more than his own representation that he will submit to the [examination], ... the court declines to change its Order of February 20, 1998.

The trial court denied Mr. Croley's subsequent emergency motion to stay the trial proceedings to permit an interlocutory appeal of the court's August 17, 1998 order denying the motion for reconsideration.

 As we consider the difficult issue as to whether the trial court abused its discretion in excluding evidence of Mr. Croley's head or brain injury as a discovery sanction, we are mindful of a longstanding principle to which we have adhered: "The trial court has broad discretion of apply discovery sanctions."[15] *Weiner v. Kneller,* 557 A.2d 1306, 1309 (D.C.1989) (citing *Lyons v. Jordan,* 524 A.2d 1199, 1201 (D.C.1987)). Abuse of discretion "may only be found where the trial judge has imposed 'a penalty too strict or unnecessary under the circumstances.'" *Id.* (quoting *Henneke v. Sommer,* 431 A.2d 6, 8 (D.C.1981) (citation omitted)). The trial court's discovery rules "generally favor strict adherence to time frames established at the beginning of the litigation process." *Mizrahi v. Schwarzmann,* 741 A.2d 399, 403 (D.C.1999). Nonetheless, our cases have emphasized "that dismissal should be granted under only the most severe circumstances and that the sanction should fit the offense." *Vincent v. Anderson,* 621 A.2d 367, 371 (D.C.1993) (citations omitted). In *Mizrahi, supra,* a case in which we vacated the trial court's judgment because we "conclude[d] that the trial court abused its discretion in denying an enlargement of time for plaintiff to take depositions of ... defendant's experts when the defendant had had the opportunity to depose all of plaintiff's experts," *id.* at 406, we followed a list of factors set forth in *Dada v. Children's Nat'l Med. Ctr.,* 715 A.2d 904, 909 (D.C.1998) to assess the trial court's exercise of discretion:

> (1) whether allowing the evidence would incurably surprise or prejudice the opposite party;
>
> (2) whether excluding the evidence would incurably prejudice the party seeking to introduce it;
>
> (3) whether the party seeking to introduce the testimony failed to comply with the evidentiary rules inadvertently or willfully;
>
> (4) the impact of allowing the proposed testimony on the orderliness and efficiency of the trial; and
>
> (5) the impact of excluding the proposed testimony on the completeness of information before the court or jury.

741 A.2d at 403–04.[16] Finally, "[w]hen a party asking for extension of discovery is

---

**15.** Super. Ct. Civ. R. 37(b)(2)(B) provides in pertinent part:

> (b) *Failure to comply with order.*
> (2) Sanctions by this Court. If a party ... fails to obey an order to provide or permit discovery ... the court may make such orders in regard to the failure as are just, including among others the following:
> (B) An order refusing to allow the disobedient party to support or oppose designated claims or defenses, or prohibiting that party from introducing designated matters in evidence.

**16.** These factors are quite similar to those set forth in *Meyers v. Pennypack Woods,* 559 F.2d 894, 904–05 (3d Cir.1977), which we referenced in *Weiner, supra,* 557 A.2d at 1310:

> (1) the prejudice or surprise in fact of the party against whom the excluded witnesses would have testified, (2) the ability of that party to cure the prejudice, (3) the extent to which waiver of the rule against calling unlisted witnesses would disrupt the orderly and efficient trial of the case or of other cases in the court, and (4) bad faith or

primarily responsible for delays, it is of course less likely to prevail on its request than if the opposing party has been the obstructing force in efficient operation of the legal system." *Id.* at 405.

In this case, almost one year elapsed between February 3, 1997, when the RNC and Mr. Mills requested that Mr. Croley schedule an IME with Dr. Ammerman regarding his head or brain injury claim, and February 3, 1998, when Mr. Croley presented an affidavit from Dr. Williams detailing his psychological abnormalities and his extreme anxiety about the examination by Dr. Ammerman. By February 3, 1998, Mr. Croley had failed to comply with at least two court orders compelling him to submit to the examination. Furthermore, after the trial court issued its February 20, 1998 order precluding Mr. Croley from introducing evidence relating to his alleged head or brain injury, he waited until July 9, 1998 to file a motion for reconsideration, even though he was aware that his trial had been rescheduled for October 19, 1998. By the time the trial court denied his motion for reconsideration, on August 17, 1998, only two months remained before trial was to begin on his complaint, which he had filed on March 26, 1985.

We note at the outset of our analysis of the head or brain injury issue, that the trial court did not dismiss Mr. Croley's lawsuit, as the RNC and Mr. Mills requested. Rather, the trial court appropriately imposed the lesser sanction of excluding evidence on one of Mr. Croley's claims. Furthermore, application of the *Mizrahi, supra,* factors on this record leads us to the conclusion that the trial court did not abuse its discretion in excluding evidence of Mr. Croley's head or brain injury as a sanction for failure to provide discovery. First, permitting Mr. Croley to introduce evidence pertaining to his head or brain injury claim, without the comple-

tion of the IME requested by the RNC and Mr. Mills, would incurably prejudice their defense by establishing an uneven playing field. Even if the trial court had accorded Mr. Croley one last opportunity to appear for the examination, the RNC and Mr. Mills would have had only two months prior to trial to schedule and take Dr. Ammerman's deposition and to mount their defense strategy against the claim. Second, it is apparent that preventing Mr. Croley from introducing evidence pertaining to his head or brain injury claim incurably prejudiced him because he was denied the opportunity to claim compensable damages relating to that injury.

Third, contrary to his assertions, it does not appear from the record before us that Mr. Croley's failure to comply with the court's orders to submit to the examination was inadvertent, prior to early February 1998. Even though he had been in treatment with Dr. Williams since 1993, no affidavit from her was presented to the trial court until early 1998. The absence of an affidavit prior to that time leaves a reasonable inference that Mr. Croley's resistance to the examination, prior to February 1998, was tactical. Fourth, allowing Mr. Croley to submit evidence regarding his head or brain injury would clearly impact the orderliness and efficiency of the trial since the trial court may have had no alternative but to continue a matter that had already been beset by numerous delays over thirteen years, in order to create a level playing field. *See Mizrahi, supra.* Thus, notions of judicial economy would have been compromised. Fifth, the exclusion of the head or brain injury claim did not impact the completeness of information before the jury, with regard to the assault. Even without knowledge that Mr. Croley may have suffered from a particular type of prolonged head trauma from the attack, the jury was nevertheless presented with substantial evidence concerning the as-

---

willfulness in failing to comply with the court's order.

We noted that the *Meyers* "court indicated that the validity of the excuse offered by the

party seeking to introduce the witness and the importance of the excluded testimony were also significant factors." *Weiner, supra,* 557 A.2d at 1310.

sault, including the chest and psychological trauma (PTSD) which Mr. Croley suffered.

Application of the *Mizrahi* factors leads us to the conclusion that the scales tip in favor of the RNC and Mr. Mills with regard to Mr. Croley's head or brain injury claim. On balance, the RNC and Mr. Mills would have suffered more prejudice than Mr. Croley. In addition, Mr. Croley must be faulted for failing to inform the trial court, after the initial court order compelling him to appear for the examination by Dr. Ammerman, that his psychological abnormalities precluded him from complying immediately with the order.

Mr. Croley raises one other matter which must be addressed with reference to the exclusion of evidence regarding his head or brain injury. He argues that the trial court abused its discretion by excluding evidence of his head or brain injury because, under the Americans With Disabilities Act of 1990 ("the ADA"), 42 U.S.C.A. § 12101 *et seq.*, it failed to make "a 'reasonable accommodation' to account for [his] disabilities, and to make 'reasonable modifications to the rules, policies, or practices' of the court to afford [him] equal opportunity to participate in the court's activities." Specifically, he claims that the trial court did not accommodate his PTSD. Mr. Croley apparently first raised the ADA in his February 25, 1998 motion for temporary stay of proceedings and continuance of the case for sixty days. However, he did not cite the ADA in his July 9, 1998 motion for reconsideration of the trial court's order excluding evidence about his head or brain injury claim, but did include a reference to the ADA and the exclusion of the head injury evidence in his September 16, 1998 emergency motion to stay the trial court proceedings pending an interlocutory appeal.

■■■■ "The [ADA] prohibits certain employers from discriminating against individuals on the basis of their disabilities." *Sutton v. United Air Lines, Inc.*, 527 U.S. 471, 475, 119 S.Ct. 2139, 144 L.Ed.2d 450 (1999). The statute provides, in pertinent part, that: "[N]o qualified individual with a disability shall, by reason of such disability, be excluded from participation in or be denied the benefits of the services, programs, or activities of a public entity, or be subjected to discrimination by any such entity." 42 U.S.C. § 12132. Courts have been deemed to fall under the definition of "public entity." *See Green v. North Arundel Hosp. Assoc., Inc.*, 126 Md.App. 394, 730 A.2d 221, 232 n. 10 (1999) ("Under the ADA's definition, state courts are public entities"); *Galloway v. Superior Court of the District of Columbia*, 816 F.Supp. 12, 19 (D.D.C.1993) ("The Superior Court and the District of Columbia are public entities within the meaning of the [ADA]"). Furthermore, under the ADA, a person is considered a "qualified individual with a disability" if he or she:

> (A) has a physical or mental impairment that substantially limits [17] one or more of the major life activities of such individual; [18] (B) has a record of such an impairment; or (3) is regarded as having such an impairment.

*Id.* at § 12102(2). Therefore, to establish that PTSD is a "disability" protected by the ADA, Mr. Croley must first show that his disorder has substantially limited one of his major life functions. *See Floyd*

---

**17.** Federal regulations define the term "substantially limits" as follows:

> Substantially limits means significantly restricted in the ability to perform either a class of jobs or a broad range of jobs in various classes as compared to the average person having comparable training, skills and abilities. The inability to perform a single, particular job does not constitute a substantial limitation in the major life activity. . . .

29 C.F.R. § 1630.2(j)(3)(i).

**18.** Although the ADA does not define "major life activities," the EEOC regulations state that

> [m]ajor life activities means functions such as caring for oneself, performing manual tasks, walking, seeing, hearing, speaking, breathing, learning, and working.

29 C.F.R. § 1630.2(i).

*Adams v. Autozoners, Inc. et al.,* 1999 WL 744039, at \*3, 1999 U.S. Dist. LEXIS 14999, at 7 ("[P]laintiff's allegation that he suffered from a mental impairment, PTSD, is not enough to assert a disability protected by the ADA. Plaintiff must also show that the impairment limited one of his major life functions"); *Hamilton v. Southwestern Bell Tel. Co.,* 136 F.3d 1047, 1050 (5 th Cir.1998) ("To determine if [plaintiff] has presented facts that indicate his PTSD is an ADA disability, we first examine whether his PTSD is an impairment that substantially limits any major life function"). To demonstrate that he has a "'record of impairment,'" Mr. Croley must show that he "has a history of … a mental or physical impairment that substantially limits one or more of his major activities.'" *Id.* (quoting 29 C.F.R. § 1630.29(k)). To establish that he is regarded as having a disability, Mr. Croley must show a mistaken belief that an "impairment substantially limits one or more major life activities." *Id.* Thus, under all three of the statutory ways in which Mr. Croley could demonstrate a disability within the meaning of the ADA, he must point to a substantial limitation in one or more major life activities.

 Mr. Croley "bears the burden of establishing an ADA violation…." *Memmer v. Marin County Courts,* 169 F.3d 630, 633 (9 th Cir.1999). The record on appeal is devoid of evidence showing that: 1) Mr. Croley's PTSD "substantially limits one or more of [his] major life activities"; 2) he has a "record of impairment" demonstrating that this disorder "substantially limits one or more of [his] major life activities"; or 3) he is regarded as having such an impairment. *See* 42 U.S.C. § 12102(2). Dr. Williams provided an affidavit in February 1998, stating, in part:

> Since the Spring 1993, I have provided therapy to Mr. Croley. During this time, I have found Mr. Croley to be suffering from certain psychological abnormalities manifested as traumatic amnesia, extreme anxiety, depression, diffi-

culty in concentration, sleep disorders, hypervigilance, tunneling, and withdrawal. I have diagnosed Mr. Croley as suffering from PTSD…. [A]t this time[,] having to participate as a party and/or witness in the trial of this case would present a significant risk to Mr. Croley's life.

Dr. Williams does not articulate how Mr. Croley's PTSD has "substantially limited" his ability to perform such "major life" activities "as caring for [him]self, performing manual tasks, walking, seeing, hearing, speaking, breathing, learning, and working." 29 C.F.R. § 1630.2(i). Indeed, Dr. Williams' affidavit does not discuss any major life function, within the meaning of the federal regulations. *See* 42 U.S.C. § 12102(2)(A). Nor does Dr. Williams' affidavit assert that no corrective measures or medication could correct Mr. Croley's medical condition. *See Sutton, supra,* 527 U.S. at 482–83, 119 S.Ct. 2139 ("A person whose physical or mental impairment is corrected by medication or other measures does not have an impairment that presently 'substantially limits' a major life activity").

Even if Mr. Croley could satisfy the "impairment in one or more major life activity" requirement, he would still have two hurdles to meet under the ADA. First, he would have to establish that the conduct of litigation, including the scheduling of discovery, is a "service, program or activity" within the meaning of the ADA. *See* Ann K. Wooster, *When Does a Public Entity Discriminate Against Disabled Individuals in its Provision of Services, Programs, or Activities Under the Americans With Disabilities Act,* 42 U.S.C.A. § 12132, 163 A.L.R. Fed. 339 (2000). Mr. Croley cites *Galloway, supra,* but that case concerned exclusion of a blind person from jury service, and thus, did not concern the conduct of litigation, including discovery, by private parties. Second, assuming, without deciding, that the conduct of litigation, including discovery, by a private individual is a "service" or "activity"

under the ADA, Mr. Croley must demonstrate that he sought and was denied reasonable accommodation. *See Memmer, supra*, 169 F.3d at 633 (citation omitted). Nothing in the record before us shows any effort on Mr. Croley's part to seek specific reasonable accommodation so that he might appear for an examination by Dr. Ammerman. For example, he did not ask to have Dr. Williams present at the site of the examination; nor did he ask that the duration of the examination be limited. While he sought information as to the manner, conditions and scope of the examination, he made no specific request for reasonable accommodation. Simply put, Mr. Croley has failed to sustain his burden of proof under the ADA. Therefore, we conclude that the trial court did not abuse its discretion in excluding evidence of Mr. Croley's head or brain injury claim.

### The Denial of the RNC's and Mr. Mills' Post-trial Motion for Judgment As to the Assault, Battery, and Negligence Claims

The RNC and Mr. Mills contend that the trial court erred in denying their post-trial motion for judgment with regard to Mr. Croley's assault, battery and negligence claims. They assert that Mr. Mills' use of force was not clearly excessive, and that Mr. Croley did not sustain his burden of proving negligence. Mr. Croley supports the trial court's denial of the motion for judgment.

 " 'Generally, a motion for judgment after trial and verdict is granted only in extreme cases.' " *Bond, supra*, 740 A.2d at 972 (internal quotation omitted) (quoting *United Mine Workers, supra*, 717 A.2d at 337 (citing *Daka, Inc. v. Breiner*, 711 A.2d 86, 96 (D.C.1998))) (other quotation omitted). "Judgment n.o.v. should be awarded only when, viewing the evidence and all reasonable inferences in the light most favorable to the party who secured the jury verdict, no juror could reasonably reach a verdict for the opponent of the motion." *McKnight v. Wire Properties, Inc.*, 288 A.2d 405, 406 (D.C.1972) (cita-

tions omitted); *see also Bond, supra*, 740 A.2d at 972.

 We agree with the trial judge that when the evidence and all reasonable inferences are viewed in the light most favorable to Mr. Croley, "the jury had an adequate basis to conclude that [he] was assaulted by [Mr. Mills] and that his use of force against [Mr. Croley] was excessive. Moreover, the jury could conclude from the evidence it received that Mr. Mills' actions amounted to negligence." The RNC and Mr. Mills rely primarily on *Jackson v. District of Columbia*, 412 A.2d 948 (D.C.1980) and *Gabrou v. May Dept. Stores Co.*, 462 A.2d 1102 (D.C.1983). Each of these cases involved law enforcement officers who were engaged in lawful arrests. When he was assaulted, Mr. Croley was not the subject of a lawful arrest. Moreover, the record on appeal clearly shows that excessive force was used against Mr. Croley. With respect to Mr. Croley's negligence claim, there was sufficient evidence presented from which a reasonable jury could conclude that Mr. Mills did not exercise ordinary care in confronting Mr. Mills, and that his negligence was the proximate cause of Mr. Croley's injuries. Consequently, we see no basis for disturbing the trial court's denial of the post-trial motion for judgment.

### The Denial of the RNC's and Mr. Mills' Motion for a New Trial or Remittitur

The RNC and Mr. Mills contend that the trial court abused its discretion in denying their motion for a new trial or remittitur. They claim, in part, that the lost future earnings award tainted the remaining sum given to Mr. Croley, and that the jury award was excessive.

 "We review the trial court's ruling on a motion for a new trial only for abuse of discretion." *Bond, supra*, 740 A.2d at 972 (citing *United Mine Workers, supra*, 717 A.2d at 337) (other citation omitted). " "To grant a motion for a new trial, the trial court must find that the

verdict is against the weight of the evidence, or that there would be a miscarriage of justice if the verdict is allowed to stand.'" *Id.* (quoting *United Mine Workers, supra,* 717 A.2d at 337). "'This court will not reverse the trial court's [granting] of a motion for … remittitur unless the trial court has abused its discretion.'" *Daka, supra,* 711 A.2d at 100 (quoting *Safeway Stores, Inc. v. Buckmon,* 652 A.2d 597, 606 (D.C.1994)) (other citations omitted). Furthermore, "'[w]e are particularly reluctant to substitute our judgment for that of the trial judge who was present at and observed the entirety of the … trial.'" *Id.* (quoting *Capitol Hill Hosp. v. Jones,* 532 A.2d 89, 93 (D.C.1987)).

On this record, we conclude that the trial court applied correct legal principles and did not abuse its discretion in denying the motion for a new trial or remittitur. The trial court carefully considered arguments made by the RNC and Mr. Mills and stated, in part:

"[T]rial courts have historically given great weight to jury verdicts …" *Louison v. Crockett,* 546 A.2d 400, 403 (D.C. 1988). And when parties have chosen the jury process as the means of resolving a legal dispute, it only seems proper for the court to afford significant deference to the collective wisdom of the jury.

Although the $600,000 award [for damages other than those for lost future earnings] is significant, and in fact is at odds with how the court saw the evidence, the court cannot substitute its views for the jury's evaluation of the evidence. The court reaches this conclusion because … the court believes the evidence was sufficient for the jury to find that the plaintiff was the victim of the negligence and assaultive behavior by the defendants. Moreover, the plaintiff testified that he suffered physical injury during the event and thereafter has suffered from post traumatic stress. The plaintiff has received medical treatment for the physical injury he testified he sustained and has received extensive therapy for what his expert witness testified was post traumatic stress, which she attributes to the encounter which resulted in the filing of the lawsuit. …

In addition, the trial court specifically disagreed "with the defendant's argument that the presentation of Dr. [Borzilleri's] testimony infected the entire verdict." Given this analysis, we see no abuse of discretion in the denial of the RNC's and Mr. Mills' motion for a new trial or remittitur.

Accordingly, for the foregoing reasons, we affirm the trial court's judgment in No. 99–CV–398, denying the appellees/cross-appellants' post-trial motions for judgment on Mr. Croley's assault, battery and negligence claims, and for a new trial or remittitur. In No. 99–CV–482, we affirm the trial court's judgment regarding punitive damages, and the exclusion of evidence concerning Mr. Croley's head or brain injury claim; but vacate its judgment pertaining to the award of lost future earnings and remand this matter with instructions to reinstate the $600,000.00 award for lost future earnings.