*Notice: This opinion is subject to formal revision before publication in the Atlantic and Maryland Reporters. Users are requested to notify the Clerk of the Court of any formal errors so that corrections may be made before the bound volumes go to press.*

# DISTRICT OF COLUMBIA COURT OF APPEALS

## Nos. 12-CV-28 and 12-CV-33

DISTRICT OF COLUMBIA, *et al*., APPELLANTS,

V.

REMI BAMIDELE, *et al*., APPELLEES.

Appeals from the Superior Court of the
District of Columbia
(CAB-1055-08)

(Hon. Erik P. Christian, Trial Judge)

(Argued April 2, 2013       Decided November 13, 2014)

 *James C. McKay*, *Jr*., Senior Assistant Attorney General, with whom *Irvin B. Nathan*, Attorney General for the District of Columbia, *Todd S. Kim*, Solicitor General, and *Donna M. Murasky*, Deputy Solicitor General, were on the brief, for appellant District of Columbia.

 *James E. McCollum*, *Jr*., for appellants Michael Callahan, Hosam Nasr, and Kathleen Wiedefeld.

 *Gregory L. Lattimer* for appellees.

 Before FISHER and MCLEESE, *Associate Judges*, and REID, *Senior Judge*.

 Opinion for the court by *Associate Judge* FISHER.

 Opinion by *Senior Judge* REID, concurring in part and dissenting in part, at page 25.

FISHER, *Associate Judge*: This case concerns a lawsuit based on the tortious conduct of "off duty" police officers at a restaurant. The officers assaulted a patron, and they engaged in other harmful actions. Following trial in the Superior Court, a jury awarded appellees Remi and Veronda Bamidele a total of $203,000 in compensatory and punitive damages against multiple defendants, including appellants Michael Callahan, Hosam Nasr, and Kathleen Wiedefeld, Metropolitan Police Department ("MPD") officers. The jury also found that Officers Callahan, Nasr, and Wiedefeld acted within the scope of their employment with the District of Columbia.

The individual officers filed a timely appeal. They argue that (a) the evidence did not support the jury's award of punitive damages against them, and (b) the award of compensatory damages was excessive as a matter of law. The District also noticed an appeal, and now contends that (a) the Bamideles failed to give it adequate notice of their claims in accordance with D.C. Code § 12-309 (2001), (b) the evidence failed to show that the officers acted within the scope of their employment, and (c) it cannot be held liable for punitive damages.

We conclude that the trial court did not abuse its discretion by declining to reduce the compensatory damages award. Moreover, there was sufficient evidence to demonstrate that Officers Callahan, Nasr, and Wiedefeld acted with malice and willful disregard of the safety and rights of others, thus justifying the jury's decision to award punitive damages against them. We note, however, that the trial court's order of judgment does not set forth the amount of punitive and compensatory damages that the jury awarded against each individual defendant. We agree with the District that, on the evidence presented, it cannot be held liable for compensatory or punitive damages.

Accordingly, we reverse the judgment against the District of Columbia. We affirm the judgments against the individual officers, but remand with instructions to amend and reenter the judgment order to fully reflect the jury's verdicts against them.

## I. FACTUAL SUMMARY

The police officers disputed much of the factual summary which follows, but we are obliged to view the record in the light most favorable to Mr. and Mrs. Bamidele. *See, e.g.*, *Giordano v. Sherwood*, 968 A.2d 494, 497 (D.C. 2009);

*Croley v. Republican Nat'l Comm*., 759 A.2d 682, 690 (D.C. 2000).  Viewed in that light, the testimony and other evidence presented at trial revealed that on the evening and early morning hours of February 2-3, 2007, Officers Callahan, Nasr, and Wiedefeld, off-duty and not in uniform, went to Clyde's Restaurant for drinks. When Clyde's closed, the officers moved to the Szechuan Gallery restaurant, where they were able to obtain more alcohol after lawful serving hours ended.  The Bamideles were already in the restaurant when the officers arrived.  Officers Callahan and Nasr were carrying their service weapons, despite an MPD policy prohibiting the consumption of alcohol while carrying a weapon.

At some point after the officers arrived, a confrontation arose between them and a group of unidentified men.  How this confrontation began was a matter of dispute at trial.  According to the Bamideles, Officer Wiedefeld appeared to be flirting with the unidentified men, which evidently angered Officers Nasr and Callahan.  The officers and the unidentified men began throwing food and other items between their tables.  During this exchange, Officer Callahan threw a plate, which shattered against the wall behind Mrs. Bamidele's head, having almost struck her.

But according to the officers, the dispute began when one of the unidentified men sexually assaulted Officer Wiedefeld.  They testified that, as she was walking from the bathroom to her table, one of the men grabbed her "rear."  After she returned to the officers' table and told Officers Nasr and Callahan what had happened, the unidentified men began throwing food.  Then, when a piece of broccoli struck Officer Callahan, he "lost his cool" and he approached the men, identifying himself and Officers Wiedefeld and Nasr as police officers.  This precipitated a "shoving match" between Officer Callahan and one of the men, which quickly devolved into "wrestling."  Officer Callahan and the man grappled with each other, knocking into and turning over tables in the crowded restaurant.

Observing the encounter, the Bamideles decided to leave the restaurant.  As they made their way out, Mr. Bamidele stopped to complain to Officer Callahan about the plate that almost struck Mrs. Bamidele.  Officer Callahan readily apologized.  But, as Mr. Bamidele and Officer Callahan were speaking, someone[1] sitting at the officers' table stood up and punched Mr. Bamidele in the face.

---

[1]  It is not clear from the record who threw this punch.  At trial, Mr. Bamidele testified that the assailant was a taller man, approximately 6' 3" in height.  Mrs. Bamidele also declared that a taller man threw the first punch.  But the officers asserted that there was no fourth person with them when the assault began.  All three officers maintained that a fourth officer, Officer Morley, was with them when they first arrived at the restaurant.  Officer Callahan described Officer

(continued…)

According to the Bamideles, the officers then viciously assaulted Mr. Bamidele. Officer Nasr stood up from the table, called Mr. Bamidele an "[a]scidia moota"[2] and began beating him. When Mrs. Bamidele tried to intervene, the officers knocked her to the floor. They continued to batter Mr. Bamidele, knocking him to the floor and stomping on him. As Mr. Bamidele climbed back to his feet, the officers shoved him against a wall; Officer Wiedefeld "pinned down" Mr. Bamidele and the other officers continued to beat him. Mrs. Bamidele begged the officers to stop, crying out, "Don't do this. Don't do this. Stop it." Unable to interrupt the assault, she fled to the restaurant entrance, where she called out for help.

Officer Phillip Henderson responded to reports of an altercation within the restaurant. When he entered, he noticed that the restaurant was in disarray: tables had been overturned, food and plates littered the floor, and a "plate was stuck in

---

(…continued)
Morley as being roughly 6' 4" tall. But he and Officer Wiedefeld both testified that Officer Morley left the restaurant sometime before the assault began.

[2] Officer Nasr apparently made these comments in Arabic. Mr. Bamidele testified that Officer Nasr literally said, "[a]scidia moota," which he translated into "ass-hole, motherfucker." Mr. Bamidele stated that he learned Arabic in his "country of origin – Nigeria."

the wall of the restaurant." He also saw an ongoing "physical dispute" or "assault." Officers Callahan and Wiedefeld were holding Mr. Bamidele against a wall. After Officer Henderson was unable to draw their attention by slapping his baton against a wooden banister, he physically intervened and pulled the officers off Mr. Bamidele. Officer Henderson described Officer Callahan as "loud," "bouncy," "upset," and "uncontrollable" while he was being interviewed by Captain Brown, who had arrived at the scene. Sergeant Harpe, another officer who had responded, eventually arrested Officer Callahan for assault, a charge that was later dismissed.

Roughly one year after the assault, the Bamideles brought suit against the District of Columbia, alleging, among other things, assault and battery. They later amended their complaint to add the three officers and the Szechuan Gallery Restaurant as defendants. The lawsuit proceeded to trial, after which the jury returned a verdict in the Bamideles' favor. In total, the jury awarded them $203,000 in damages, including $70,000 in compensatory damages and $110,000 in punitive damages against the individual officers.[3] The jury also found that the officers acted in the scope of their employment.

---

[3] Specifically, the jury awarded Mr. Bamidele $25,000 in compensatory damages and $35,000 in punitive damages against Officer Callahan; $15,000 in
(continued…)

Following trial, the District moved for judgment notwithstanding the verdict, or in the alternative for a new trial. It contended that the evidence failed to show that the individual officers acted in the scope of their employment. It also requested a remittitur, arguing that the compensatory damages were excessive. Finally, the District asserted that the award of punitive damages was improper as a matter of public policy, and that the officers did not act with malicious intent.

The Superior Court denied the District's motion. Concluding that there was evidence to show the officers had been acting in the scope of their employment, the court cited "testimonial evidence in the trial record: that the officers intended—at least in part—to take official police action in response to an assault against one of them." As to the District's request for a remittitur, the court held that "[t]he compensatory damage verdict . . . is well inside the 'maximum limit of a reasonable range' for a jury to award[,]" given "the harm suffered by [the

---

(…continued)
compensatory damages and $30,000 in punitive damages against Officer Wiedefeld; and $20,000 in compensatory damages and $35,000 in punitive damages against Officer Nasr. The jury awarded Mrs. Bamidele $10,000 in compensatory damages and $10,000 in punitive damages against Officer Callahan, but made no award against Officers Wiedefeld and Nasr. The jury also awarded the Bamideles $23,000 against the Szechuan Gallery restaurant. The restaurant has not appealed from this judgment.

Bamideles], including physical beating, humiliation, and emotional distress." The trial court rejected the District's arguments as to punitive damages, finding, among other things, that "the award here will tend to discourage the conduct demonstrated by the officers in this case, which will undoubtedly redound to the public benefit."

## II.  The Officers' Liability

The individual officers claim that the awards of compensatory damages are excessive and that the trial court should have granted a remittitur.  They also maintain that there is no basis for the punitive damages awards, because the Bamideles offered no evidence to show that the officers acted with malice.  We disagree.

### A.  Compensatory Damages

Under our case law, if the trial court determines that a particular damages award is "beyond all reason, or . . . is so great as to shock the conscience," it may require the plaintiff to accept a reduced award or face a new trial.  *Scott v. Crestar Fin. Corp.*, 928 A.2d 680, 688 (D.C. 2007) (quoting *Wingfield v. Peoples Drug Store*, 379 A.2d 685, 687 (D.C. 1977)).  In determining whether such a reduction is

appropriate, the trial court should consider not only the size of the award, but also whether the decision of the jury was based on "passion, prejudice, mistake, or [the] consideration of improper factors . . . ." *Scott*, 928 A.2d at 688. We "will not reverse the trial court's denial of a motion for . . . remittitur unless the trial court has abused its discretion." *Daka*, *Inc. v. Breiner*, 711 A.2d 86, 100 (D.C. 1998).

Here, the trial court reasonably concluded that the jury's award was not so incongruous with the Bamideles' actual injuries as to "shock the conscience." Like the trial court, we are persuaded that the Bamideles presented evidence from which the jury could reasonably conclude that they suffered significant physical injuries, pain, and emotional distress. In particular, Mr. Bamidele testified that, in addition to sustaining a deep gash to his left shin and bruising about his body, he experienced backaches as well as "unbearable" headaches as a result of the officers banging his head "on the back of the wall." Moreover, he continued to suffer from headaches, backaches, and persistent neck stiffness more than three years after the attack. As a result of the attack, he still experiences "a lot of fear." Specifically, he "fear[s] the police now—the D.C. police. I don't come to D.C. at night any longer." He dwelled on the assault each time he came into the District, and the attack impacted his mental well-being to the point that it affected his relationship with his children. Mrs. Bamidele also described her physical injuries

to the jury: she suffered a scratch to her leg during the scuffle.[4] There was also evidence to suggest that Mrs. Bamidele suffered significant emotional distress traceable to the officers' violent assault of her husband as she begged them to stop.

In sum, we are satisfied that there was sufficient evidence presented at trial to justify the jury's compensatory awards. And, on this record, we cannot say that the trial court abused its discretion by concluding that the jury's compensatory damages award was not "beyond all reason, or . . . so great as to shock the conscience." *United Mine Workers of Am., Int'l Union v. Moore*, 717 A.2d 332, 341 (D.C. 1998) (quoting *Wingfield*, 379 A.2d at 687).

## B. Punitive Damages

Officers Callahan, Nasr, and Wiedefeld also argue that there was no basis for awarding punitive damages, because the Bamideles failed to present clear-and-convincing evidence that the officers acted with malice. In particular, they claim that, while there may have been sufficient evidence to establish the assault itself, assaultive conduct standing alone does not demonstrate malice.

---

[4] While this injury was less severe than the injuries Mr. Bamidele suffered, the jury appears to have taken this fact into account—awarding her a substantially lower sum ($10,000) than Mr. Bamidele received ($60,000).

To recover punitive damages, the plaintiff must prove more than mere tortious conduct; plaintiff must also prove by clear-and-convincing evidence that the defendant's tortious acts were "accompanied by conduct and a state of mind evincing malice or its equivalent." *District of Columbia v. Jackson*, 810 A.2d 388, 396 (D.C. 2002) (quoting *Jonathan Woodner Co. v. Breeden*, 665 A.2d 929, 938 (D.C. 1995)). To establish "malice or its equivalent," the plaintiff must prove two things: (1) "the defendant acted with evil motive, actual malice, deliberate violence or oppression, or with intent to injure, or in willful disregard for the rights of the plaintiff"; and (2) "the defendant's conduct itself was outrageous, grossly fraudulent, or reckless toward the safety of the plaintiff." *District of Columbia v. Jackson*, 810 A.2d at 396 (quoting *Croley*, 759 A.2d at 695). In determining whether the plaintiffs carried this burden at trial, we view the evidence in the light most favorable to their cause, asking only "whether there was evidence from which a jury reasonably could find the required malicious intent or willful disregard of another's rights." *Tolson v. District of Columbia*, 860 A.2d 336, 345 (D.C. 2004) (quoting *King v. Kirlin Enters.*, 626 A.2d 882, 884 (D.C. 1993)).

While "[p]unitive damages are not allowable in every case of assault and battery," they are permissible "where there is evidence of actual malice, wanton

conduct, deliberate violence, or intent to injure." *King*, 626 A.2d at 884 (quoting *Wanis v. Zwennes*, 364 A.2d 1193, 1195 (D.C. 1976)). In distinguishing between assaultive conduct that will justify punitive damages and that which will not, we have considered "all the facts and circumstances of the case," looking in particular to "the aggravated nature of the defendant's conduct (and, inferentially, [his or her] state of mind) . . . ." *King*, 626 A.2d at 884.

The record shows that the Bamideles sustained their burden to "prove, by a preponderance of the evidence, that [Officers Callahan, Nasr, and Wiedefeld] committed a tortious act, and by clear and convincing evidence that the act was accompanied by conduct and a state of mind evincing malice or its equivalent." *Croley*, 759 A.2d at 695. Therefore, we see no reason to disturb the trial court's post-trial ruling that "the record evidence and all inferences drawn therefrom support a finding of outrageous and reckless conduct sufficient to support the [punitive damages] award[s]" against the individual officers. The record permitted the jury to conclude that the officers' conduct was sufficiently aggravated to support an inference that they intended to injure Mr. Bamidele. The jury could have inferred this intent not merely from the sheer intensity of the assault, but also from the officers' flagrant disregard for the safety of those around them.

In reaching this conclusion, we look to the contrast between our decisions in *King* and *Croley*. In *Croley*, two Republican National Committee security guards accosted the plaintiff as he was photographing a dumpster adjacent to an RNC office building. 759 A.2d at 686. When the plaintiff would not stop taking pictures, one of the guards pulled him to the ground and placed his foot on the plaintiff's chest. *Id.* at 686, 696. The plaintiff did not allege that the guards delivered other blows, engaged in any sustained assaultive conduct, or committed any acts placing him in physical danger prior to the assault. *See id.* at 686. Nor did the guards make any aggressive comments or gestures tending to reveal their malicious intent. *Id.* at 686, 696. This conduct, we held, was insufficient to justify the award of punitive damages, and we held that the trial court did not err in refusing to submit that issue to the jury. *Id.* at 696.

In *King*, by contrast, the defendant violently assaulted the plaintiff after the two men were involved in a traffic incident. 626 A.2d at 883. The defendant first angled his car into the plaintiff's lane, causing the plaintiff to pull his car to the side of the road. *Id.* As the plaintiff exited his car, the defendant rushed him, yelling racial epithets while throwing repeated punches to the plaintiff's head. *Id.* When the plaintiff warded the defendant off with a knife, the defendant briefly retreated. *Id.* But, when the plaintiff returned his weapon to his car, the defendant

immediately resumed his attack. *Id.* Based on this evidence, we held that a jury could reasonably conclude that the defendant "harbored an 'evil motive' toward [the plaintiff] and engaged in 'deliberate violence' against him." *Id.* at 884.

The case at hand is more like *King* than *Croley*. As in *King*, the individual defendants in this case engaged in conduct prior to the assault which endangered the plaintiffs' safety: they threw objects across the restaurant, one of which almost struck Mrs. Bamidele. Furthermore, the assault in this case and the assault in *King* both came after essentially no provocation: Before the attack, Mr. Bamidele merely told Officer Callahan in a "quiet way" that the "next time you throw plates, be careful where it [sic] lands." *Cf. id.* at 884 ("[A] jury could find that [the defendant] initiated a second assault without any provocation."). Another factor likening this case to *King*, but distinguishing it from *Croley*, was Officer Nasr's abusive outburst. As Officer Nasr rose from the table, he called Mr. Bamidele words meaning "ass-hole" and "motherfucker." Such derogatory comments were absent in *Croley*, 759 A.2d at 696 ("[The plaintiff's] account is devoid of comments or mention of gestures by [the defendants] . . . ."), but were present in *King*, 626 A.2d at 883 (noting that the defendant shouted "racial epithets and obscenities"). Finally, both *King* and the case at hand involved sustained, violent attacks: Here, the three officers beat and kicked Mr. Bamidele, knocked him to the

floor, stomped on him, then held him against a wall while they landed further blows. C*f. id.* ("[The defendant] rushed from his car and began punching [the plaintiff] in the head and face . . . .").

In contrast, *Croley* involved an assault that was much less extreme, sustained, and violent. In that case, the defendant did not batter or verbally abuse the plaintiff; he pulled the plaintiff to the ground and placed a foot on his chest. *Croley*, 759 A.2d at 686, 696. The officers' conduct in this case was much more extreme and prolonged. Indeed, Officers Callahan and Wiedefeld were so engaged in their attack that a uniformed police officer responding to the scene had to physically pull them off Mr. Bamidele. Thus, unlike the defendant's comparatively mild conduct in *Croley*, the intensity of the officers' attack here manifested an intent to injure Mr. Bamidele. *Cf. King*, 626 A.2d at 884 (holding that defendant's unprovoked assault demonstrated his intent to engage in "deliberate violence" against the plaintiff).

While the sheer violence involved in the assault on Mr. Bamidele would itself be enough to permit the jury to infer malice, the officers also displayed a reckless disregard for the safety and rights of those around them; by their own admission, the officers consumed alcohol after lawful hours, and two of them

violated MPD policies against carrying a weapon while doing so. The officers were impaired to varying degrees; but Officer Callahan was so intoxicated that he could "barely even stand." Indeed, Officer Callahan's conduct reflected his impairment: He threw a plate that nearly struck Mrs. Bamidele; engaged in a "wrestling" match with an unidentified man in a crowded restaurant; and then, along with Officer Wiedefeld, refused to break off his assault on Mr. Bamidele, forcing Officer Henderson to physically pull him off Mr. Bamidele. In total, the officers' actions—consuming alcohol while armed in a crowded restaurant, then engaging in an uncontrolled brawl—evinced their "willful disregard" for the rights of those around them, *King*, 626 A.2d at 884, including the Bamideles.

In sum, we are satisfied that the evidence was sufficient to submit the Bamideles' punitive-damages claim to the jury. Moreover, we agree with the trial court that there is no basis for overturning the jury's award of punitive damages against Officers Callahan, Nasr, and Wiedefeld.

### III. The District's Liability

The District contends that it is not liable for the damages awarded against the individual officers because (a) the evidence did not show that they acted within

the scope of their employment and, in any event, (b) the District is not liable for punitive damages because it neither participated in nor ratified their assault.[5]

## A. Compensatory Damages

The District maintains that the evidence failed to establish that the officers were acting within the scope of their employment when they assaulted Mr. Bamidele. "As a general rule, whether an employee is acting within the scope of his employment is a question of fact for the jury. It becomes a question of law for the court, however, if there is not sufficient evidence from which a reasonable juror could conclude that the action was within the scope of the employment." *Brown v. Argenbright Sec.*, 782 A.2d 752, 757 (D.C. 2001) (internal quotation marks omitted). We hold as a matter of law that the officers' assaultive conduct against the Bamideles was not within the scope of their employment. *See Great A & P Tea Co. v. Aveilhe*, 116 A.2d 162, 163-66 (D.C. 1955) (reversing jury verdict

---

[5] Before trial, the District moved to dismiss the Bamideles' complaint for failure to comply with D.C. Code § 12-309, which requires plaintiffs who intend to sue the District to give the Mayor's office written notice of their claims within six months of their injury. The trial court denied the District's motion, and the District argues on appeal that this was error. In light of our conclusion that the District is not liable for either compensatory or punitive damages, we do not discuss the issue of notice.

on ground that there was insufficient evidence to permit conclusion that horseplay between two store employees that injured patron was within scope of employment).

To be within the scope of employment, the tortious activity "must be actuated, at least in part, by a purpose to further the master's business," and this "intent or purpose . . . excludes from the scope of employment all actions committed solely for [the servant's] own purposes." *Weinberg v. Johnson*, 518 A.2d 985, 990 (D.C. 1986) (internal quotation marks omitted) (alteration in original). "However, if the employee acts in part to serve his employer's interest, the employer will be held liable for the intentional torts of his employee even if prompted partially by personal motives, such as revenge." *Hechinger Co. v. Johnson*, 761 A.2d 15, 24 (D.C. 2000). The tortious conduct must also be foreseeable to the employer, meaning that it is "'a direct outgrowth of the employee's instructions or job assignments.'" *Herbin v. Hoeffel*, 886 A.2d 507, 509 (D.C. 2005) (quoting *Penn Cent. Transp. Co. v. Reddick*, 398 A.2d 27, 32 (D.C. 1979)).

In their trial testimony, all three officers asserted that, at least initially, they intended to take police action against the unidentified men in response to an assault

on Officer Wiedefeld. This testimony may have revealed their motivation to further the District's interests as to the unidentified men, but it does not demonstrate the same intent vis-à-vis the Bamideles. "Conduct of a servant [that] is . . . too little actuated by a purpose to serve the master" is not within the scope of employment. *Restatement (Second) of Agency* § 228 (2) (1958).[6]

The Bamideles rely upon regulations which say that a police officer is always on duty. These same regulations were cited in *District of Columbia v. Coron*, 515 A.2d 435 (D.C. 1986), where an off-duty police officer had beaten a pedestrian who (with ample justification) had kicked at his car. We did not "interpret such regulations as imposing liability on an employer for the intentional torts of its employee where the employee's conduct was motivated solely by personal reasons." *Id.* at 438. Relying in part on *Restatement* § 228(2), we overturned a jury verdict which held the District of Columbia liable based on the principles of *respondeat superior*.

We noted that the officer "was dressed in civilian clothing and driving his own automobile on a purely personal venture at the time of the incident." *Id.* at

---

[6] We have long endorsed the Second Restatement's approach. *See, e.g.*, *Murphy v. Army Distaff Found.*, 458 A.2d 61, 63 n.2 (D.C. 1983); *Johnson v. Weinberg*, 434 A.2d 404, 408 (D.C. 1981).

438. On the other hand, during the beating he had asked, "who the hell do you think you are, kicking my car. I'm a policeman." *Id*. at 437. He and his companion displayed their police badges and the companion stated, "we both have guns and we know how to use them." *Id*. Nevertheless, we concluded that his "entire behavior during this incident reflected that of an individual bent on personal vengeance for a perceived personal affront." *Id.* at 438.

At least where intentional torts are concerned, it is not enough that an employee's tortious activity occurs while he is on duty, or even that those duties bear some causal relationship to the tort. For example, in *Boykin v. District of Columbia*, 484 A.2d 560 (D.C. 1984), we considered "a sexual assault on a student by an employee of the District of Columbia public schools during the school day and in a school building." *Id*. at 561. The employee's duties required him to be in physical contact with the student. *Id.* at 562. Nevertheless, the sexual assault "arose out of [the employee's] assignment only in the sense that [his] walks with the student afforded him the *opportunity* to pursue his personal adventure." *Id*. at 563. It "was in no degree committed to serve the school's interest, but rather appears to have been done solely for the accomplishment of [the employee's] independent, malicious, mischievous and selfish purposes." *Id*. at 562. We held that the evidence was "insufficient to make the District vicariously liable for [the

employee's] act," *id*. at 563, and we upheld the trial court's decision granting summary judgment to the District of Columbia. *Id*. at 564.

In this case the officers were off-duty, they were not in uniform, and they were at the restaurant for purely personal reasons. They certainly were not acting within the scope of their employment when they were throwing food at the unidentified men who occupied a nearby table, or when Officer Callahan threw the plate that nearly struck Mrs. Bamidele. At some point they began to respond to an assault on Officer Wiedefeld, as was their duty. *See* D.C. Code § 5-115.03 (2008) (making it a misdemeanor for any officer to "neglect making any arrest for an offense . . . committed in his presence"). But they did not intend to take police action against Mr. and Mrs. Bamidele, nor did the Bamideles become accidentally entangled in the officers' scuffle with the unidentified men. Rather, the assault seems to have been precipitated by Mr. Bamidele's comment to Officer Callahan, which prompted Officer Nasr to call him a pejorative name and to begin beating him. We therefore conclude, as a matter of law, that the officers were not acting within the scope of their employment and that the District of Columbia is not vicariously liable for the awards of compensatory damages.

## B. Punitive Damages

While we have concluded that the individual officers may be held liable for punitive damages, we reach a different conclusion as to the District. First, it appears that the Amended Complaint did not seek punitive damages against the District, and the jury was not asked to hold the District liable for punitive damages. When the court instructed on that issue, it made clear that the claim for punitive damages focused on the individual police officers. Although the verdict form differentiated between compensatory damages and punitive damages with respect to each plaintiff and each police officer, it did not ask the jury to assess any damages against the District of Columbia. Instead, the jury was asked to determine whether each individual officer "was acting within the scope of his [or her] employment with the District of Columbia in furtherance of the District of Columbia's purposes on February 3, 2007."

The District concedes that all parties anticipated that the District would be vicariously liable for the compensatory damages portion of the awards against the individual officers, given the jury's conclusion that they acted within the scope of their employment. But those findings were not legally sufficient to make the District vicariously liable for punitive damages. There was no evidence offered at trial to support a finding that the District authorized, participated in, or

subsequently ratified the individual officers' tortious conduct. Without such evidence, the District could not be held liable for punitive damages. *See Snow v. Capitol Terrace, Inc.*, 602 A.2d 121, 127 (D.C. 1992); *Woodard v. City Stores Co.*, 334 A.2d 189, 191 (D.C. 1975); *Darrin v. Capital Transit Co.*, 90 A.2d 823, 825 (D.C. 1952); *Restatement (Second) of Torts* § 909 (1979). Moreover, the jury was not instructed on these requirements, nor does its verdict reflect such findings. We therefore conclude that the District of Columbia is not liable for the awards of punitive damages.[7]

## IV. Conclusion

For the foregoing reasons, we reverse the judgment against the District of Columbia. We affirm the judgments against the individual officers. But as we noted above, the trial court's judgment order does not fully reflect the jury's verdict. The order does not itemize the damages awarded against each individual officer, distinguishing between the compensatory damages and the punitive

---

[7] We reject the Bamideles' assertion that it is too late for the District to question its liability for punitive damages because it did not challenge the form of the judgment. The judgment did not impose any liability on the District, ordering only that judgment be entered against Officers Callahan, Wiedefeld, and Nasr, and the Szechuan Gallery Restaurant in the total amount of $203,000.

damages awarded against each individual officer. Thus, we remand the case with instructions to amend and reenter the order.

*So ordered.*

REID, *Senior Judge*, concurring in part and dissenting in part: REID, *Senior Judge*, concurring in part and dissenting in part: I fully join Part II of Judge Fisher's opinion relating to the officers' liability for compensatory and punitive damages. I also fully join Part III B of Judge Fisher's opinion concerning the District's non-liability for punitive damages. However, based on my review of the record and applicable legal principles, I am unable to agree with Part III A of Judge Fisher's opinion which rejects the jury's special verdict regarding whether the officers were acting within the scope of their employment, and instead, "conclude[s], as a matter of law, that the officers were not acting within the scope of their employment and that the District of Columbia is not vicariously liable for the award of compensatory damages." In my view, the trial court properly denied the District's motions for judgment as a matter of law with respect to the scope of employment issue. I also would reject the District's main argument that the Bamideles did not provide proper notice of their claim under D.C. Code § 12-309. Hence I would affirm the jury finding "by a preponderance of the evidence," that

Officers Callahan, Wiedefeld, and Nasr were "acting within the scope of [their] employment with the District of Columbia in furtherance of the District of Columbia's purposes on February 3, 2007."

I first address the District's motions for judgment as a matter of law as to the vicarious liability issue. In *Bean v. Gutierrez*, 980 A.2d 1090 (D.C. 2009), we reiterated that,

> [j]udgment as a matter of law is appropriate only where no reasonable person viewing the evidence in the light most favorable to the prevailing party, could reach a verdict in favor of that party. (citations and internal quotation marks omitted). Moreover, when the case turns on disputed factual issues and credibility determinations, the case is for the jury to decide[;] [i]f reasonable persons might differ, the issue should be submitted to the jury. Furthermore, in reviewing a motion for [judgment as a matter of law] after a jury verdict, this court applies the same standard as the trial court.

*Id*. at 1093 (citing *Lively v. Flexible Packaging Ass'n*, 830 A.2d 874, 886 (D.C. 2003) (en banc)).

The majority opinion recognizes that, "[a]s a general rule, whether an employee is acting 'within the scope of employment' is a question of fact for the jury; [i]t becomes a question of law for the court, however, if there is not sufficient

evidence from which a reasonable juror could conclude that the action was within the scope of the employment." *Boykin v. District of Columbia*, 484 A.2d 560, 562 (D.C. 1984) (citations omitted). I believe that the trial judge faithfully adhered to the applicable legal standard and principles in allowing the case to go forth to the jury and in declining to grant the District's post-verdict motion for judgment as a matter of law. The evidence in this case revealed significant differences in the factual accounts by witnesses, and hence, the factual context for determining what occurred at the Szechuan Gallery and whether the officers acted within the scope of their employment was in dispute. I believe that some of the evidence, if credited by the jury (as apparently it was) reveals that reasonable persons might differ as to whether Officers Callahan, Wiedefeld and Nasr were acting within the scope of their employment at the Szechuan, and that reasonable jurors could conclude that they were indeed acting within the scope of their employment.

The majority opinion essentially separates the factual testimony provided by witnesses into two scenarios – one relating to the assault on Officer Wiedefeld and the three unidentified men seated at a table adjacent to the table where the officers were seated, and the other scenario relating to the assault on Mr. Bamidele by the officers. In taking this approach the majority opinion acknowledges that the officers had an intent to carry out their duty as police officers by investigating the

assault on Officer Wiedefeld but the opinion asserts that the officers "did not intend to take police action against Mr. and Mrs. Bamidele, nor did the Bamideles become accidentally entangled in the officers' scuffle with the unidentified men." Therefore, the opinion states, "as a matter of law, . . . the officers were not acting within the scope of their employment and . . . the District of Columbia is not vicariously liable for the awards of compensatory damages."

None of the witnesses provided clear times at which the events unfolded, from the throwing of the objects to the assaults on Officer Wiedefeld and Mr. Bamidele. However, viewed in the light most favorable to the Bamideles, there is testimony on which reasonable jurors could conclude that the incident involving the officers' investigation of the assault on Officer Wiedefeld and the assault on Mr. Bamidele, which his wife witnessed, actually were spliced together, and not sharply separated incidents, and that the actions by the officers against Mr. Bamidele took place in the midst of their investigation of the assault on Officer Wiedefeld.

Officer Nasr was called as a witness by counsel for the Bamideles. He testified that he was drinking at Clyde's restaurant but not at Szechuan, that he only ate at Szechuan, and that "shortly after" he "attempted to confront [the]

individuals [at the adjacent table] concerning the sexual assault on Officer Wiedefeld," he "had to turn [his] attention to Mr. Bamidele who approached in a hostile manner." Officer Nasr "was trying to calm him, let him know we were handling the situation." Officer Nasr was "approached with a secondary threat, . . . Mr. Bamidele coming up with his fists balled. He [wa]s visibly angry." Mr. Bamidele indicated that "he was angry, felt like he was disrespected." Officer Nasr "tried to calm him down," saying , "listen, we're going to handle this." They were in "tight quarters" in the Szechuan and someone pushed Officer Nasr from behind toward Mr. Bamidele, whereupon Mr. Bamidele "lunge[d] to the bar and grab[bed] [a] wine glass," and [h]e swung that wine glass." At some point the glass broke and Officer Nasr felt that Mr. Bamidele had "an edged weapon," and that he (Officer Nasr) had been "trained to take action." As Officer Nasr put it, "when you have somebody pull a weapon, you have to react to that and . . . I was able to get []hold of Mr. Bamidele, stop him from causing any injury - - further injury to anybody else - - any other civilians that would have been in the restaurant until he dropped that glass." Officer Nasr asserted that he received a contusion to his forehead during the encounter with Mr. Bamidele.

Later during trial, Officer Nasr was called again and he testified on behalf of the defendant officers. Before repeating his description of Mr. Bamidele's

approach, he testified that when Officer Wiedefeld returned to the officers' table from the bathroom and said she had just been grabbed, "she was pretty upset" and her face was "flush." She pointed out the men at the adjacent table. While the officers "were trying to figure out what had happened," the men at the adjacent table started to throw food in the direction of the officers. Officers Callahan, Wiedefeld, and Nasr "g[o]t up . . . to . . . confront [the men][,] . . . identify them and take police action." As Officer Nasr put it, "she was the victim and she was there, so we had to go identify the suspect and possibly place him under arrest." Officers Callahan and Wiedefeld were beside Officer Nasr. Upon seeing Mr. Bamidele, Officer Nasr turned to try to calm him and to "let him know this wasn't about him, that we would handle it." The men at the adjacent table were "cursing at [the officers and] yelling." Officer Nasr "notice[d] [that] Mr. Bamidele [was] visibly upset." He repeated his earlier testimony about his interaction with Mr. Bamidele.

Officer Callahan was called as a witness for the Bamideles. During cross-examination by the officers' defense counsel, he stated that while he "was talking to Officer Wiedefeld trying to figure out what happened, [he] g[o]t hit in the face with a piece of broccoli." That "shocked" him and he took the saucer from underneath his tea cup and "smashed it on the table out of frustration."

"Immediately" after that he got up and approached the men at the table from which the broccoli was thrown. His intent was "to confront [the men] about the assault and to detain them." He identified himself and Officer Wiedefeld as police officers. One of the men pushed him in the chest and he in turn pushed the man and they got into "a little wrestling match." He did not see Mr. Bamidele at that time, and "maybe 20 minutes later" he saw Mr. Bamidele in the bathroom; Officer Callahan told him he was "sorry about what happened," referring to his (Officer Callahan's) altercation with the unidentified men. He never saw anyone punch Mr. Bamidele, and he did not strike Mr. Bamidele.

Mr. Bamidele testified that he and his wife sat at a table for two at the Szechuan, another table for two was next to their table, and a round table at which the officers (at that point he did not know they were officers) sat was behind him. He saw Officer Wiedefeld going back and forth between the table next to his and the round table. After the broccoli and plate were thrown near Mr. Bamidele and his wife, Mr. Bamidele asked for and paid his check, and he and his wife walked between the round table and the table next to the one at which they had been seated. Mr. Bamidele observed that Officer Callahan was drunk. Mr. Bamidele informed Officer Callahan that he almost hit his wife. Officer Callahan punched Mr. Bamidele in the face and Officer Nasr cursed and hit Mr. Bamidele. Officer

Wiedefeld "used her elbow across [Mr. Bamidele's] neck [and] pressed [him] against the wall." According to Mr. Bamidele, Officer Anderson (sic) came into the Szechuan, saw what the officers were doing, and called the officers by name. Mr. Bamidele denied grabbing a wine glass. He saw Officer Callahan in the bathroom later while he (Mr. Bamidele) "was washing all the dust and . . . all the scratches off [his] hands." Officer Callahan said he was sorry. Officer Phillip Henderson was on duty when a citizen informed him of an incident or dispute at the Szechuan. Upon entering the restaurant he saw Officers Callahan and Wiedefeld holding Mr. Bamidele against the wall. The restaurant "was a mess" with "tables turned over, . . . plates of food on the floor," and "a plate . . . stuck in the wall of the restaurant."

Reasonable jurors could make credibility determinations based on the aforementioned testimony. In addition, the jurors could reasonably infer and conclude that Officers Callahan, Wiedefeld, and Nasr expressed an intent to take police action at the Szechuan relating to the assault against Officer Wiedefeld, and further, that at least Officer Nasr (with a reasonable inference that he was assisted by Officers Callahan and Wiedefeld) engaged in police action against Mr. Bamidele purportedly to assure him that he and the others could handle the sexual assault investigation, and to prevent injury to the officers or others at the Szechuan.

Given the cited testimony, I cannot agree with the majority opinion that Officers Callahan, Wiedefeld, and Nasr only engaged in a "purely personal venture," or were motivated "solely by personal reasons." *See District of Columbia v. Coron*, 515 A.2d 435, 438 (D.C. 1986) (off duty officer who had been drinking almost hit a pedestrian twice and when the pedestrian kicked at his car, the officer and a fellow off duty officer jumped out of the car, knocked the pedestrian and repeatedly hit him in the face and stomach; as a matter of law the officers were not acting within the scope of their employment). As articulated in two of this court's early cases, by which this court is bound, to be outside the scope of employment, the employees' actions must be "entirely disconnected from the work of the master, or the actions could only be characterized as a "personal mischievous whim," or the actions were done "solely for the accomplishment of the independent . . . mischievous purpose of the servant." *Great A&T Tea Co., v. Aveilhe*, 116 A.2d 162, 165-66 (D.C. 1955) (jury could not reasonably infer that a "series of events consisting of two clerks conversing, laughing, and one pulling upon the other causing him to fall into a bystanding customer, could be of any benefit to their employer or in furtherance of the duties assigned to them"). Unlike the factual context in *Coron* and *Aveilhe*, reasonable jurors could infer and conclude that Officers Callahan, Wiedefeld and Nasr were not engaged in a

"purely personal venture," or that their actions were not "entirely disconnected from the work of the [District]." *Id.* Rather, they were motivated "at least in part by an intent to further [MPD's] business" by investigating an alleged assault and precluding another patron of the Szechuan not only from interfering with the investigation but also from causing injury to the officers or others at the Szechuan; and hence, the injuries to the Bamideles were "the outgrowth of . . . action undertaken in the employer's behalf." *Boykin*, *supra*, 484 A.2d at 563-64 (D.C. 1984).

Because I believe that the officers acted at least in part in furtherance of MPD's business, I must reach the District's threshold and main argument that it is "entitled to judgment because plaintiffs failed to comply with the notice-of-claim requirements of D.C. Code § 12-309." The notice statute provides that "within six months after the injury or damage was sustained, the claimant, his agent or attorney" must "give[] notice in writing to the Mayor of the District of Columbia of the approximate time, place, cause, and circumstances of the injury or damage." D.C. Code § 12-309 (2012 Repl.); *see also Washington v. District of Columbia*, 429 A.2d 1362, 1365 (D.C. 1981) (purpose of notice is to give the District an opportunity to ascertain the facts and to adjust the claim). The statute also specifies that: "A report in writing by the Metropolitan Police Department, in

regular course of duty, is a sufficient notice under this section." D.C. Code § 12-309. However, police reports must contain the same information, with "the same degree of specificity," required for any other form of notice. *Pitts v. District of Columbia*, 391 A.2d 803, 808 (D.C. 1978) (quoting *Jenkins v. District of Columbia*, 379 A.2d 1177, 1178 (D.C. 1977)).

Nevertheless, "section 12-309 does not require 'precise exactness' with respect to the details of the police reports." *Doe by Fein v. District of Columbia*, 697 A.2d 23, 28 (D.C. 1997) (internal quotation marks and citation omitted) (citing *Washington*, *supra*, 429 A.2d at 1365). Moreover, notice need not be in the form of a single, authoritative record; plaintiffs may piece together adequate notice using multiple documents. *See Enders v. District of Columbia*, 4 A.3d 457, 468 (D.C. 2010); *Jones v. District of Columbia*, 879 F. Supp. 2d 69, 78 (D.D.C. 2012). Thus, a police report "provides sufficient notice of the 'cause' of an injury to satisfy the statutory requirement, if it recites facts from which it could be reasonably anticipated that a claim against the District might arise." *Pitts*, *supra*, 391 A.2d at 809 (citation omitted).

In essence, the notice question raised by the District requires focus on whether any of the three reports of the February 3, 2007, incident, compiled by

MPD personnel, gave the District notice that it could reasonably anticipate a vicarious liability claim against the District by the Bamideles. I conclude that the February 3, 2007, police incident-based report, filed on the same day by MPD Officer Phillip Henderson, who responded to the scene, standing alone, did not provide adequate notice under D.C. Code § 12-309, that the District might be vicariously liable for injury to the Bamideles due to actions of its employees while acting within the scope of their employment. The only person named in that report was Michael Callahan, but he was not identified as a police officer. While Ms. Bamidele declared in her accompanying statement that as many as five additional assailants were involved, she did not specify that any of these individuals were District employees.

Subsequently, however, MPD's Office of Internal Affairs ("OIA") produced two reports about the February 3 incident. In my view, the February 3 incident-based report, combined with the OIA reports, dated February 20 and April 25, 2007, provided adequate notice that the District might be vicariously liable for the assault on Mr. Bamidele by its employees (Officers Callahan, Wiedefeld, and Nasr) because by Officer Callahan's identification of himself and Officer Wiedefeld as police officers after the assault on Officer Wiedefeld and by all three officers expressing an intent to take police action, they were acting within the

scope of their employment at the Szechuan. The OIA reports, unlike the incident-based report, unambiguously identified the individuals who assaulted Mr. Bamidele as MPD officers. Moreover, the April 25 report stated: "[Mr. Bamidele] alleged that Officer . . . Callahan, . . . assisted by Officers . . . Nasr and . . . Wiedefeld, assaulted him." The report also contains details suggesting that these officers were acting in the scope of their employment. Officer Callahan told the internal affairs investigator that he displayed his badge when he confronted the three unidentified men in the Szechuan restaurant after the alleged assault on Officer Wiedefeld. Officer Wiedefeld "stated that Officer Callahan spoke for the [officers and] advis[ed] [the unidentified men] that they were 'Cops.'" The accounts of all the officers reveal that they were responding to an assault on Officer Wiedefeld or acting to prevent injury by a restaurant patron to others in the restaurant, actions for which they had a legal duty to respond. *See* D.C. Code § 5-115.03 (2008) (making it a misdemeanor for any officer to "neglect making any arrest for an offense . . . committed in his presence").

While these reports do not fully describe the Bamideles' injuries or explicitly indicate that they planned to bring claims against the District, § 12-309 does not require such exacting specificity. It is true that, because the statute abrogates the District's common-law tort immunity, we interpret it strictly. *Pitts*,

*supra*, 391 A.2d at 807. But in regard to the "details" of a plaintiff's notice, we have taken a more forgiving approach, stating that "[p]recise exactness is not absolutely essential." *Id.* (quoting *Hurd v. District of Columbia*, 106 A.2d 702, 705 (D.C. 1954)). To satisfy the statute, the combined MPD reports need not have "fully reflect[ed] every salient fact concerning the potential liability of the District with the same degree of clarity and specificity as a document drawn by an attorney." *Id.* at 809. Rather, they need only have "recit[ed] facts from which it could be reasonably anticipated that a claim against the District might arise." *Id.* I believe that these reports notified the District that it could be vicariously liable for the actions of the three police officers.[1]

I distinguish this case from *Doe by Fein*, in which we found that the plaintiff failed to notify the District of facts from which it could reasonably anticipate that its own liability might arise. *Doe by Fein*, *supra*, 697 A.3d at 31. Unlike the situation in that case, the OIA investigative reports in this case are police reports, and they were made "in regular course of duty," as § 12-309 requires. *Id.*

---

[1] The District argues that, even if the OIA reports provided notice of Mr. Bamidele's potential claim, they did not mention any injury to Ms. Bamidele. I disagree. Both the February 20 and April 25 reports indicate that Officer Callahan threw a plate, which almost struck Ms. Bamidele. Moreover, both reports clearly indicate that Ms. Bamidele was present during the assault and witnessed the officers beating her husband.

Furthermore, the Bamideles did not assert any direct liability theory against the District; their sole theory was *respondeat superior*. In my view, *Gaskins v. District of Columbia Hous. Auth.*, 904 A.2d 360 (D.C. 2006), also is distinguishable. Here, unlike *Gaskins*, the collective OIA and incident-based reports, all of which constitute police reports, not only specified the cause of the Bamideles injury—the assault by Officers Callahan, Nasr, and Wiedefeld—but they also recited facts that provided reasonable notice to the District that it could be vicariously liable because the officers may have caused the Bamideles' injuries while acting within the scope of their employment. Furthermore, contrary to the District's argument that the OIA reports do not qualify as police reports "in regular course of duty," and that only contemporaneous, incident-based reports fall within the statutory exception, the United States District Court for the District of Columbia, has ruled consistently, at least since 1986, that reports generated by MPD's Internal Affairs Division "are reports created in the regular course of duty." *Jones*, *supra*, 879 F. Supp. 2d at 80 (citing *Shaw v. District of Columbia*, No. 5-CV-1284, 2006 WL 1274765, at *12 (D.D.C. May 8, 2006)). Here, MPD completed both of its OIA reports well before the expiration of the six month time frame set forth in § 12-309, and in my view, the February 3 incident-based report, combined with the OIA reports, provided sufficient notice of "the approximate time, place, cause, and circumstances of the injury or damage." D.C. Code § 12-

309. In short, the combined MPD reports constitute the type of "full detailed official report[s]," reflecting "an immediate and thorough investigation" of the incident, that we have said serve D.C. Code § 12-309's statutory purpose. *Pitts*, *supra*, 391 A.2d at 808 (quoting *Thomas v. Potomac Elec. Power Co.*, 266 F. Supp. 687, 694 (D.D.C. 1967)).

In sum, I would deny the District's motions for judgment as a matter of law, as they related to the District's vicarious liability for the compensatory damages the jury awarded against the officers. I would also deny the motions because I believe the record reflects that the Bamideles met the notice requirements of D.C. Code § 12-309.